Jodie B. **LICHTENSTEIN**, an individual, Plaintiff,

v.

**KIDDER, PEABODY & CO., INCORPORATED**, a Delaware corporation, Defendant.

**Civ. A. No. 89–1143.**

United States District Court, W.D. Pennsylvania.

Dec. 28, 1989.

Kenneth A. Eisner, Markel, Schaefer & Means, P.C., Pittsburgh, Pa., for plaintiff.

Richard R. Nelson, II, Alder, Cohen & Grigsby, P.C., Pittsburgh, Pa., for defendant.

## MEMORANDUM OPINION

COHILL, Chief Judge.

Plaintiff, a Pennsylvania resident and a former client of defendant Kidder, Peabody & Company ("Kidder, Peabody"), a Delaware corporation, charges that she lost substantial amounts of money as a result of unauthorized transactions in her account and the payment of funds from her account over her forged signature on Visa checks. This Court has jurisdiction pursuant to 28 U.S.C. § 1332 due to the diversity of citizenship between the parties.

Presently before the Court is defendant's Motion for Partial Summary Judgment. For the reasons stated below, we will grant this motion.

## BACKGROUND

On April 8, 1985, plaintiff opened a "Premium Account" with Kidder, Peabody. Complaint, ¶ 10. This account allowed plaintiff to deposit cash and securities, and, through a program administered by Kidder, Peabody in connection with Bank One of Columbus, N.A., to draft checks against these assets. *Id.* at ¶¶ 11–13, Affidavit of Boyd S. Murray, Kidder, Peabody Branch Manager, ¶ 3. Plaintiff listed her address on Kidder, Peabody's Client Information Form as 6111 Penn Avenue, Pittsburgh, Pennsylvania. Defendant's Exhibit 2. Plaintiff asserts that she deposited a substantial portion of her life savings (in excess of $200,000 in cash and securities) into the account "with the expectation that she could utilize the income but would always be able to preserve the principal of the Premium Account." Complaint at ¶¶ 9, 15.

Plaintiff charges that her indorsement was forged to authorize the transfer of securities she owned into the Premium Account, and to authorize their sale. *Id.* at ¶¶ 19–28. She further charges that bonds in which she had an ownership interest were redeemed over her forged indorsement. *Id.* at ¶¶ 30, 32. She alleges that in each case, defendant guaranteed the signatures as being hers. *Id.* at 21, 26, 31.

According to plaintiff's complaint, "[f]rom June 17, 1985 until May 2, 1987, all

of the securities of the Plaintiff that were in the Securities Account were sold and the proceeds from such sales were applied by the Defendant to the Visa Account [from which checks could be written]." *Id.* at ¶ 44. During the same period, plaintiff alleges, "at least 94 Visa checks were drawn on the Visa Account in an aggregate amount of not less than $219,800.00, as a proximate result of Visa checks allegedly signed by the Plaintiff...." *Id.* at ¶ 41.

Plaintiff alleges that the signatures on these checks were forged. *Id.* at ¶ 42. She asserts that monthly statements regarding the Premium Account were sent to the business address of Alan Lichtenstein, her husband, rather than to her residential address. *Id.* at ¶ 39. Plaintiff was divorced from Alan Lichtenstein on July 25, 1988. *Id.* at ¶ 4. According to defendant's third-party complaint against Alan Lichtenstein, plaintiff has alleged that Mr. Lichtenstein forged her signature on various checks and other instruments.

Plaintiff charges defendant with conversion, negligence, breach of fiduciary duty, and breach of express and implied contract for its involvement in these transactions. Defendant has moved for partial summary judgment on the ground that Section 4–406 of the Uniform Commercial Code (codified at 13 Pa.Cons.Stat. § 4406) precludes the plaintiff from asserting forgery on most of the checks at issue because she failed to report the problem to defendant within one year from the time account statements were made available to her.

## DISCUSSION

Pennsylvania's codification of UCC § 4–406 states in pertinent part:

(a) General rule.—When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after discovery thereof.

.    .    .    .    .

(d) Statutes of limitations applicable to customer.—Without regard to care or lack of care of either the customer or the bank a customer who does not within one year from the time the statement and items are made available to the customer (subsection (a)) discover and report his unauthorized signature or any alteration on the face or back of the item or does not within three years from that time discover and report any unauthorized indorsement is precluded from asserting against the bank such unauthorized signature or indorsement or such alteration. 13 Pa.Cons.Stat. § 4406.

The affidavit of a Kidder, Peabody official states that of at least 111 checks drawn on plaintiff's account, all but five were drawn, paid, and evidenced on monthly statements mailed to plaintiff prior to August 20, 1986. Murray Affidavit at ¶ 7. The official further states that Kidder, Peabody first learned of the alleged unauthorized transactions from a letter sent by plaintiff's attorney dated August 20, 1987. *Id.* at ¶ 8–9. Defendant argues that § 4406(d) precludes plaintiff from recovering against defendant on the pre-August, 1986 checks.

In deciding whether defendant can successfully assert the § 4406(d) defense against plaintiff, we must determine whether Kidder, Peabody qualifies as a "bank" and whether the statements and items were made available to the plaintiff.

### A. Definition of "Bank"

■ Uniform Commercial Code § 1–201(4) and 13 Pa.Cons.Stat. § 1201 define "bank" as "[a]ny person engaged in the business of banking." While the UCC does not define "business of banking," it has long been held that an entity which in the regular course of business receives deposits and allows withdrawals by draft is in the business of banking. *Warren v. Shook*, 91 U.S. 704, 710, 23 L.Ed. 421, 423

(1875); *Rosenblum v. Anglim,* 135 F.2d 512, 513 (9th Cir.1943).

Courts have held that an entity given authority to engage in "banking business" should be considered a "bank" for purposes of the UCC. *See, e.g., First Nat'l Bank of Nocona v. Duncan Savings and Loan Ass'n,* 656 F.Supp. 358 (W.D.Okla.1987). In *Asian Int'l v. Merrill Lynch, Pierce, Fenner and Smith, Inc.,* 435 So.2d 1058, 1062 (La.Ct.App.1983), the investment brokerage firm Merrill Lynch, while not incorporated as a bank under state law, was considered a bank under the UCC because it provided its customer with a general securities and checking account.

Plaintiff argues that we should look to state banking regulations for the definition of "bank," as at least one court has done. In *Congress Indus. v. Fed. Life Ins. Co.,* 114 Ariz. 361, 560 P.2d 1268 (1977), an Arizona appeals court found that a title company was not a bank for purposes of the UCC because it did not fit the banking regulation statute's definition of banking as " 'the business of receiving money on deposit subject to payment by check or any other form of order or request or on presentation of a certificate of deposit or other evidence of debt....' " 560 P.2d at 1271 (quoting Ariz.Rev.Stat. § 6–201(B)). Plaintiff directs our attention to the following definition under the Pennsylvania Banking Code of 1965:

> "Bank"—a corporation which exists under the laws of this Commonwealth and, as a bank under the Banking Code of 1933, was authorized to engage in the business of receiving demand deposits on the effective date of this act, or which receives authority to engage in such business as a bank pursuant to this act, but which is not authorized to act as fiduciary. 7 Pa.Stat. § 102(f).

Plaintiff argues that Kidder, Peabody, a Delaware corporation, is authorized to do business in Pennsylvania pursuant only to a Certificate of Authority which entitles it "to purchase, sell and deal in stocks, bonds, mortgages, open accounts, and other evidences of indebtedness and to have all powers necessary and essential to effectuate the foregoing." Plaintiff's Brief, 3; Plaintiff's Exhibit 1. According to plaintiff, neither the state nor federal government recognize Kidder, Peabody as a bank for regulatory purposes. Plaintiff's Brief, 3–4. In fact, state law specifically excludes from banking regulations "[a] broker who is licensed under the laws of this Commonwealth to the extent he engages in such activities solely as an incident of the conduct of the brokerage business." 7 Pa. Stat. § 105(b)(iv). There is no evidence that Kidder, Peabody holds itself out to the public as a bank. Thus, plaintiff argues, Kidder, Peabody is not a bank under Pennsylvania law and should be precluded from asserting the protection of § 4406.

We reject plaintiff's argument. Introductory language in the definition section of Title 13 states that "the following words and phrases *when used in this title* shall have, unless the context clearly indicates otherwise, the meanings given to them in *this* section." 13 Pa.Cons.Stat. § 1201 (emphasis added). The definition section of Title 7 contains similar language. Thus, it would contravene the plain language of the Pennsylvania code to use the relatively narrow definition of "bank" under Title 7 to explain the meaning of "bank" under Title 13 "unless the context clearly indicates otherwise."

But in fact, an examination of the context reveals the strongest argument for considering Kidder, Peabody a bank for purposes of § 4406. The Uniform Commercial Code was established to provide a uniform body of rules governing commercial transactions. This purpose is specifically set forth in Pennsylvania's version of UCC § 1–102:

> **Purposes and policies of title.** Underlying purposes and policies of this title are:
>
> (1) To simplify, clarify and modernize the law governing commercial transactions.
>
> (2) To permit the continued expansion of commercial practices through custom, usage and agreement of the parties.

(3) To make uniform the law among the various jurisdictions.

13 Pa. Cons. Stat. § 1102(b).

The same section also states, "This title shall be liberally construed and applied to promote its underlying purposes and policies." 13 Pa.Cons.Stat. § 1102(a).

Although we find no Pennsylvania case law directly on point, it appears consistent with the stated purposes of Title 13 and with case law in other states that a brokerage firm which offers check-writing services to its clients should be governed by the same commercial rules that govern checking accounts generally. It would be anomalous to establish one rule for checking accounts administered by a bank, and another rule for checking accounts administered by a brokerage firm in connection with a bank. The public policy interest in establishing a clear system of rights and liabilities between parties to a commercial transaction is the same in both cases. We therefore find, as did the Louisiana state court in *Asian Int'l*, that a brokerage firm offering checking services should be considered a bank for purposes of UCC § 4–406.

**B. Availability of Records Under § 4406**

■ Plaintiff argues that even if Kidder, Peabody is considered a bank, § 4406 does not preclude plaintiff from asserting a cause of action against the bank because statements and items were not "made available" to her. According to a Kidder, Peabody official, defendant sent a monthly statement addressed to plaintiff at the address given by her on the Premium Account Client Information Form. Murray Affidavit at ¶ 4. These monthly statements recorded all transactions in the account, including the payment of checks. *Id.* Pursuant to the terms of the Premium Account Agreement, the checks themselves did not accompany the statements, but were available upon request. *Id.* at ¶ 5.

While plaintiff does not dispute these facts, she argues that they fail to demonstrate that Kidder, Peabody made the statements and checks available to her within the meaning of § 4406. She places great emphasis on the fact that checks did not accompany the monthly statements,

and asserts that she "could only request up to three items of check and transaction documentation per month without incurring a charge." Plaintiff's Brief, 6; Plaintiff's Exhibit 2. She submits that the one-year period began sometime after August 20, 1987, when Kidder, Peabody mailed copies of cancelled checks to her at her attorney's request. Plaintiff's Brief, 7.

A customer's duty to exercise reasonable care and promptness to examine the account statement and items is triggered

> [w]hen a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer *or otherwise in a reasonable manner makes the statement and items available to the customer. . . .*

13 Pa. Cons. Stat. § 4406(a) (emphasis added).

It appears to this Court that defendant acted reasonably under § 4406(a) in sending plaintiff a monthly statement of account listing all account transactions. Although the actual checks were not sent to the plaintiff each month, an examination of the monthly statement would certainly have given plaintiff notice of the large number of allegedly unauthorized transactions occurring in the account.

A number of banks have adopted a system of "truncating" checks, in which the bank provides a statement of account to the customer, but provides copies of the checks only upon the customer's request. Professors White and Summers, the foremost commentators on the Uniform Commercial Code, have praised the adoption of check truncation for the economic savings to be gained from the reduction of processing costs, and have discussed the effect check truncation should have on UCC § 4–406:

> Because the customer will receive some form of monthly summary of the items charged against his account (organized perhaps by date, number and dollar amount, though not by payee at this point) he will have the capacity to make a comparison with his check register to

discover, for example, items charged to his account that he did not write or items on which the amount has been raised. As to thefts that would be so revealed, the customer should retain the kind of liability he has now under 4–406. That is so because he is the lowest cost-risk avoider. He, better than the bank (which is machine processing a huge volume of checks) can guard his checks and make the necessary comparisons, and the law should require that he do so or bear the cost of forgeries. 2 J. White & R. Summers, *Uniform Commercial Code* 791 (3d ed. 1988).

Pennsylvania case law supports the proposition that a bank that has not sent checks directly to the customer, but has merely made them available, has complied with the requirements of § 4406. In *McMickle v. Girard Bank*, 356 Pa.Super. 521, 515 A.2d 16 (1986), a bank customer ordered the bank to send account statements and checks to her attorney, who subsequently forged her name on two checks. The court held that the statement and checks had been made "available" within the meaning of § 4406. 515 A.2d at 17. We hold that in this case, Kidder, Peabody fulfilled its obligation under § 4406 when it sent monthly account statements to the plaintiff at the address she provided, and made copies of the checks available to her upon request.

## CONCLUSION

The parties to this motion do not dispute the essential facts in this case. We therefore find that "there is no genuine issue as to any material fact" that would benefit from a trial. Fed.R.Civ.P. 56(c). The parties disagree solely over the legal issue of whether Kidder, Peabody may claim the protection of § 4406 as a defense with regard to certain checks. For the foregoing reasons, we find that defendant is entitled to judgment in its favor on this issue as a matter of law.

An appropriate ORDER will issue.