Argued and submitted March 18, 1998, affirmed on appeal and cross-appeal
July 7, 1999

**EDWARD D. JONES & CO.,**
a foreign limited partnership,
*Appellant - Cross-Respondent,*

*v.*

**Thomas MISHLER,**
*Respondent - Cross-Appellant.*

(CV94-320; CA A92971)

983 P2d 1086

G. Kenneth Shiroishi argued the cause for appellant - cross-respondent. With him on the briefs were Frank H. Hilton and Dunn, Carney, Allen, Higgins & Tongue.

Allyn E. Brown argued the cause for respondent - cross-appellant. With him on the brief was Brown & Tarlow, P.C.

Before De Muniz, Presiding Judge, and Haselton and Linder, Judges.

LINDER, J.

**LINDER, J.**

This case involves a dispute over who should bear losses incurred as a result of checks deposited into a money market account that later were returned for insufficient funds. By way of appeal, cross-assignment of error, and cross-appeal, the parties raise and argue several related issues. Principal among them is whether an investment entity that provides its customers with accounts into which they can deposit funds and from which they can make demand withdrawals by check is a "bank" for purposes of the Uniform Commercial Code (UCC) governing bank collections, ORS chapter 74. We hold, as did the trial court, that such an entity is a bank under the UCC. Based on that holding and our resolution of the other issues presented, we affirm on the appeal and cross-appeal.

The parties do not dispute most of the pertinent facts, although they disagree about the significance of, and the characterization that should be given to, some of those facts. Plaintiff, Edward D. Jones & Company, is a broker-dealer in securities and a member of the New York Stock Exchange. In general, plaintiff is not subject to federal or state banking regulations, but instead is regulated under federal and state securities laws. Defendant was one of plaintiff's clients. Among the services plaintiff offers is a Daily Passport Cash Trust (DPCT) account, which is a money market fund account. In February 1990, defendant opened such an account. According to defendant, when he opened the account, he was told that it was just like a bank money market checking account. Defendant, in fact, was issued checks to use to make withdrawals from the account. The checks were mailed to defendant in an envelope bearing plaintiff's name. Although plaintiff describes itself as an agent of the money market fund's manager, Federated Investors, the checks issued to defendant did not include Federated's name. Instead, the checks bore plaintiff's name and, below it, the name of State Street Bank of Boston, Massachusetts. The only statement defendant received regarding the account was a monthly statement from plaintiff.

The minimum amount of a check written on the account was $500. The accounts were not insured by the Federal Deposit Insurance Corporation. According to plaintiff, the money market mutual fund "principally invests in government guaranteed and other highly rated securities." Plaintiff's policy—followed in this case—was to give customers immediate credit for checks and other funds deposited into DPCT accounts, allowing them to write DPCT checks on those funds immediately. In other words, plaintiff did not demand that its customers wait for checks, including two-party checks, to clear. At trial, plaintiff described DPCT checks as "redemption orders." On appeal, plaintiff maintains that "DPCT 'checks' represent an investor's written instruction, which is directed to the fund rather than to [plaintiff], to redeem a sufficient number of DPCT shares from that client's account to cover the amount specified in the 'check.'" According to plaintiff, "the DPCT 'check-writing' privilege is simply a means by which an investor effects a liquidation of his DPCT investment in an amount sufficient to cover the face value of any 'check' written by the client."

When defendant opened his DPCT account with plaintiff, the parties entered into a Financial Services Account (FSA) agreement, which is a form agreement prepared by plaintiff. The agreement uses the word "check." It also provides for the use of a "debit card" in conjunction with the account. The provisions of the agreement on which plaintiff principally relies read as follows:

"In addition, each time I write a Check, the Check will be forwarded promptly for payment. When a Check or Card charge is presented for payment, a sufficient number of Fund shares will be redeemed to cover the amount of the Card charge or Check. In the event Check or Card amounts presented for payment exceed my Fund Share balance, [plaintiff] is authorized to make payments for such charges from free credit cash balances in my account or to liquidate securities being held in my account. *Should these sources prove insufficient, [plaintiff], although not obligated to do so, may in its discretion, advance monies on my behalf representing a loan to me* for which I will be charged interest at the same rate [plaintiff] charges on other margin loans.

"* * * * *

"I may terminate my FSA at any time, but I will remain responsible for any charges to my account, whether arising before or after termination."

(Emphasis added; capitalization in original.)

In December 1990, several months after he opened his DPCT account with plaintiff, defendant deposited two two-party checks totaling $53,500 into his account. Plaintiff promptly credited that amount to defendant's account. The checks to defendant were written on the account of Dan Chapman, supposedly as partial repayment of a $128,000 debt that Chapman ultimately never repaid. On the same day that defendant deposited the first of Chapman's checks into his DPCT account, he wrote two checks on the account totaling more than $20,000. Nothing in the record suggests, and plaintiff does not contend, that defendant knew at the time that Chapman's checks were not good. On December 13, and December 18, 1990, respectively, plaintiff learned that the first and second of Chapman's checks to defendant had been dishonored by Chapman's bank because he had insufficient funds in his account. Plaintiff then "charged back" or deducted the original $53,500 from defendant's DPCT account. As a result, and because in the interim defendant wrote checks on his account with plaintiff, defendant's account with plaintiff was overdrawn.

After unsuccessful attempts to recoup the money from defendant, plaintiff sued for the amount of the overdraft, plus interest. Plaintiff's complaint alleged that defendant had a "Daily Passport Cash Trust" account with plaintiff, that in December 1990 defendant deposited two two-party checks totaling more than $53,000 into that account, that those checks ultimately were not honored by the maker's bank and that, as a result and because defendant wrote checks on his account in the interim, his account became overdrawn in the amount of $19,401.37. Plaintiff also alleged that, despite repeated requests, defendant had not reimbursed plaintiff for the amount of the overdraft. Plaintiff sought damages and its attorney fees.

In an amended answer, filed after the trial court denied both parties' motions for summary judgment, defendant asserted that plaintiff was a "bank" within the meaning of *former* ORS 71.2010(4) (1989), which was in effect during the time of the pertinent transactions. Defendant also counterclaimed for damages, contending that plaintiff had wrongfully converted $34,065.09 from his account because it had not given him timely notice of the dishonor of the two checks he had deposited, as he asserted, was required by statute. In addition, defendant counterclaimed for breach of contract, based on the claim that plaintiff would not pay him the money he contended was in his account.

In its motion for summary judgment (which the trial court later denied), plaintiff also argued claims for breach of contract and unjust enrichment. In its breach of contract claim, plaintiff relied on the language from the FSA agreement that we have set out above (which provides that monies advanced by plaintiff to defendant represent loans), and plaintiff contended that defendant had violated his obligation to repay the "loan." With respect to the claim for unjust enrichment, plaintiff argued that, "[i]n equity and good conscience," defendant should be required to repay the amount overdrawn from his account.

In ruling for defendant on the merits, the trial court concluded that, at least with respect to the check-writing account used by defendant, plaintiff was a "bank" that could "charge back" its customer's (defendant's) account for the amount of the checks only if it gave timely notice that the checks deposited into the account had not been honored. The court also found that plaintiff had not given defendant such timely notice. For that reason, the trial court ruled for defendant on his counterclaim, concluding that plaintiff had converted $34,065.09 from defendant's account. The court also determined that plaintiff, rather than defendant, had breached the contractual agreement between them. In addition, the court rejected plaintiff's claim of unjust enrichment. Finally, the court ruled that defendant was not statutorily entitled to an award of attorney fees.

On appeal, plaintiff contends that the trial court erred in concluding that, at least with respect to defendant's

account with it, plaintiff is a "bank." Plaintiff also argues that, even if it is a "bank" with respect to defendant's account and even if it failed to give timely notice that the checks defendant deposited did not clear, its damages for "charging back" the overdraft to that account nevertheless should be limited to those resulting from plaintiff's failure to notify defendant earlier that the checks had not cleared. Plaintiff maintains that, here, defendant did not and cannot prove any such harm. Therefore, plaintiff argues, the trial court erred in deciding that it had converted money from defendant's account and in ordering plaintiff to pay defendant damages. Plaintiff also contends that the trial court mistakenly rejected its breach of contract and unjust enrichment claims.

Defendant insists that plaintiff did not timely raise and thus did not preserve the issue of whether, if plaintiff is a "bank" and if it therefore was required to give him timely notice of the dishonor of the two checks he had deposited, defendant was required, as a prerequisite to recovery, to prove he was damaged as a result of plaintiff's tardy notice to him that the checks had bounced. Defendant also cross-assigns error to the trial court's decision, made at the close of trial, allowing plaintiff in effect to amend its complaint to conform to its proof and to add breach of contract and unjust enrichment claims. Defendant cross-appeals from the trial court's decision not to award him his attorney fees.

We hold that, at least with respect to the type of account defendant had with it, plaintiff was operating as a "bank" and that, therefore, plaintiff was required to give timely notice of the dishonor of the checks defendant had deposited. We agree with the trial court that plaintiff failed to give such timely notice of dishonor. We further hold that, below, plaintiff did not timely raise, and thus did not preserve, the issue of whether a showing of resultant damage is a necessary component of defendant's case based on an improper "charge back" to or a deduction from his account. Furthermore, plaintiff has assigned error to a nonappealable event—*viz.*, the denial of a motion for a new trial, made without any preceding challenge to the sufficiency of the evidence. We also conclude that we do not need to determine whether the trial judge abused his discretion in allowing plaintiff to add its breach of contract and unjust enrichment claims,

because we decide in any event that plaintiff is not entitled to prevail on either claim. Finally, we hold that defendant is not entitled to an award of attorney fees under the statute he cites, and we, therefore, affirm on his cross-appeal.

■ On plaintiff's appeal from the money judgment for defendant, as a matter of logic the first question is whether plaintiff is a "bank," at least with regard to defendant's account with it. If plaintiff is a "bank" within the meaning of the 1989 Oregon version of the UCC, which the parties agree is the version applicable in this case, then plaintiff was required to give timely notice to defendant of the dishonor of the two checks he had deposited into his account. ORS 74.2120(1) (1989) provided that:

> "If a collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, suspension of payments by a bank or otherwise to receive a settlement for the item which is or becomes final, the bank may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account or obtain refund from its customer whether or not it is able to return the items *if by its midnight deadline or within a longer reasonable time after it learns the facts it returns the item or sends notification of the facts.* These rights to charge back and obtain refund terminate if and when a settlement for the item received by the bank is or becomes final pursuant to ORS 74.2110(3) and 74.2130(2) and (3)."[1]

(Emphasis added.)

Under the terms of this statute, if plaintiff was a "bank" and if ORS 74.2120(1) (1989) applied to it, then, in order to "charge back the amount of credit" to its customer's (*i.e.,* to defendant's) account, plaintiff was required to notify defendant of the fact that the checks he deposited had been dishonored "by its midnight deadline or within a longer reasonable time after it learn[ed] the facts[.]" Plaintiff does

---

[1] Many provisions of the UCC, including *former* ORS 74.2120(1) (1989), were amended in 1993, after the 1990 and 1991 transactions that are at issue in this case. Or Laws 1993, ch 545. The revised version of *former* ORS 74.2120(1) is now found in ORS 74.2140(1). Or Laws 1993, ch 545, § 97. The present version of the statute will be discussed later in this opinion.

not contend and the evidence does not suggest that it met any "midnight deadline."[2] Plaintiff does not dispute that it received notice on December 13 and December 18, 1990, respectively, that the two checks defendant had deposited into his account had not been honored. The trial court found as fact that "[t]he earliest that one can say that any kind of notice [of the dishonor] went out to [defendant] would have to be the December 30, 1990 financial statement, which according to [plaintiff's witness] would have been mailed within 5 business days after December 31, 1990."[3] The trial court also found that "clearly that was a considerable period of time after" Chapman's checks had been dishonored by his bank, and the court concluded that "[c]ertainly to wait that long to get notice of dishonor cannot be considered reasonable or in compliance with the statute that governs this in the UCC." On appeal, plaintiff does not challenge the trial court's factual findings or claim that it gave defendant timely notice of dishonor. Instead, plaintiff contends that the trial court erred because it is not a "bank" within the meaning of ORS 71.2010(4) (1989) and because it therefore did not have to give defendant timely notice of dishonor pursuant to ORS 74.2120(1) (1989).

■ We resolve this issue of statutory construction by attempting to ascertain the intended meaning of the statute, looking first to its text in context and, if necessary, then to its legislative history and other interpretive aids. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). As noted above, ORS 74.2120(1) (1989) applies if a "collecting bank has made provisional settlement with its customer for an item and itself fails by reason of dishonor, * * * or otherwise to receive a final settlement for the item

---

[2] *Former* ORS 74.1040(1)(h) (1989) defined the " '[m]idnight deadline' with respect to a bank [as] midnight on its next banking day following the banking day on which it received the relevant item or notice or from which the time for taking action commences to run, whichever is later." The (same) definition is now found in ORS 74.1040(1)(j). The "purpose of the midnight deadline is to encourage the prompt return of checks." *South Sound Nat'l Bank v. Citizens Valley Bank*, 65 Or App 562, 565, 672 P2d 1198 (1983). *See also South Sound Nat'l Bank v. First Int. Bank*, 65 Or App 553, 558, 672 P2d 1194 (1983).

[3] Defendant contended that he did not receive this statement. The trial court did not resolve this factual dispute, and we need not resolve it on appeal.

\* \* \*." We conclude that if plaintiff is a "bank," then the statute otherwise applies and required plaintiff to give defendant timely notice of the dishonor of Chapman's checks. That is so, first, because here plaintiff made a provisional settlement with its customer—defendant—when it gave him immediate credit for the two-party checks he deposited into his account. Ultimately, because Chapman did not have sufficient funds in his bank account, plaintiff did not itself receive final settlement for the deposited checks. Moreover, if plaintiff is a "bank," it is a "collecting bank" within the meaning of the statute. A "collecting bank" is "any bank handling [an] item for collection except the payer bank." ORS 74.1050(4)(1989).[4] Here, with respect to Chapman's checks written to defendant, plaintiff was handling an item for collection and it was not the payer bank.[5] The issue thus narrows to determining whether plaintiff is a "bank" at all.

"Bank" was defined in ORS 71.2010(4) (1989) as "any person engaged in the business of banking."[6] That definition is not particularly helpful in determining whether plaintiff was acting as a bank in this case. Commentators have observed that:

> "[i]t is not clear whether the 1962 definition [of "bank"—the definition set out in ORS 71.2010(4) (1989)] is confined to those institutions traditionally considered to be banks, such as commercial banks and savings banks, or whether the definition includes such financial institutions as savings and loan associations, credit unions, and other organizations that permit the opening of demand accounts or accounts designated as money market accounts or the like."

Henry J. Bailey and Richard B. Hagedorn, 1 *Brady on Bank Checks,* ¶ 1.24, at 1-54 to 1-55 (revised ed 1997). Another commentator has suggested that the UCC intentionally does

---

[4] The definition of "collecting bank" still is found in ORS 74.1050(4), although the spelling of "payer" has been changed to "payor."

[5] The term "payer bank" was defined as "a bank by which an item is payable as drawn or accepted." ORS 74.1050(2) (1989).

[6] "Bank" subsequently was redefined in the 1993 revision of the UCC, and then was redefined again in 1997 in a provision that is unique to Oregon's version of the UCC. Or Laws 1993, ch 545, § 76; Or Laws 1997, ch 631, § 380. *See* Henry J. Bailey and Richard B. Hagedorn, 1 *Brady on Bank Checks,* ¶ 1.24, at 1-56 (revised ed 1996). We will discuss those amendments later in this opinion.

not further define the "business of banking" in order to allow a flexible approach that can adapt to changing financial circumstances and institutions. Ronald A. Anderson, 1A *Uniform Commercial Code*, § 1-201:772, at 130 (3d ed 1996). He contends that the code's flexible approach also "permits [it] to apply to persons and to organizations which engage in only a restricted area or segment of the total possible banking business." *Id.* (footnote omitted).

Despite the lack of specificity in the statutory definition of "bank" found in ORS 71.2010(4) (1989), we derive significant contextual clues from other pertinent UCC provisions. In particular, the subsections of ORS 74.1050 (1989) defined certain specific types of banks. The statutory definition of "collecting bank" is given above. To reiterate, a "collecting bank" is one that handles an item for collection. The statute also defined a "[d]epositary bank" as "the first bank to which an item is transferred for collection even though it is also the payer bank" and, as noted above, a "payer bank" as "a bank by which an item is payable as drawn or accepted." ORS 74.1050(1), (2) (1989). An "[i]ntermediary bank" was "any bank to which an item is transferred in course of collection except the depositary or payer bank"; a "[p]resenting bank" was "any bank presenting an item except a payer bank"; and a " '[r]emitting bank' mean[t] any payer or intermediary bank remitting for an item." ORS 74.1050(3), (5), (6) (1989).[7]

At first glance, those definitions also may appear unenlightening and circular because they simply use the term "bank" to define types of banks. On closer examination, however, the statute provides a convincing contextual clue. For purposes of ORS chapter 74, as is demonstrated by the definitions quoted above, the statutory concern is with "banks" that process, pay on, and collect "items," such as checks.[8] That is, the types of banks that are described in ORS

---

[7] Similar definitions for all of those types of banks (except for "remitting banks," which no longer are statutorily defined) still are found in ORS 74.1050(2) to (6).

[8] An "item" was defined as "any instrument for the payment of money even though it is not negotiable but does not include money." ORS 74.1040(1)(g) (1989). "Item" now is statutorily defined as "an instrument or a promise to pay money handled by a bank for collection or payment. The term does not include a payment

74.1050 (1989) are defined with respect to their role in that processing and collection process.[9] Plaintiff's participation in that process also provides the precise basis on which defendant claims, and the trial court found, that plaintiff is a "bank" in this case. Said differently, because the concern of ORS chapter 74 (or Article 4 of the code) is with "the aspect of bank collections" only, Anderson, 1A *Uniform Commercial Code,* § 1-201:772 at 131, rather than with banking in general, the analysis of the meaning of "bank" as used in ORS 74.2120(4) (1989) similarly should focus on function—*i.e.,* whether a supposed "bank" is an entity or person engaged in processing, paying on, and collecting on "items," including checks.

That approach is not at odds with, although it may be more focused than, an analysis based on the general definition of "banking." "Banking" generally has been defined as "taking money on deposit subject to check or draft, loaning money and credit, * * * issuing drafts and any other associated form of general dealing in money or credit." *Webster's Third New Int'l Dictionary*, 172 (unabridged ed 1993). Banking also has been defined as "the business of banking, * * * consist[ing of] the issue of notes payable on demand intended to circulate as money[,] * * * receiving deposits payable on demand; * * * negotiating loans, and dealing in negotiable securities issued by the government, state and national, and municipal and other corporations." *Black's Law Dictionary*, 146 (6th ed 1990).

Applying those general definitions, and focusing on the bank collection process that is the overarching concern of ORS chapter 74, indicates that, at least with respect to the DPCT account defendant had, plaintiff is a "bank" within the

---

order governed by ORS chapter 74A or a credit or debit card slip." ORS 74.1040(1)(I).

[9] "UCC Article 4, ORS chapter 74, sets forth the law of bank deposits and collection of items * * *. For the most part, Article 4 is addressed to the deposit, collection, and payment of checks through the banking system of the United States. The Article deals with the legal relationships between customers of banks who deposit checks for collection; banks involved in the deposit, collection, and payment process; and customers of payor banks at the other end of the line who draw the checks chargeable against their accounts."

Henry J. Bailey III, 2 *Oregon Uniform Commercial Code* § 4.1, at 242 (2d ed 1990).

meaning of ORS 74.2120(1) (1989). Plaintiff offered defendant an account that included check-writing privileges. Defendant received the checks in an envelope that bore plaintiff's name, and the only account statement defendant received was the monthly statement from plaintiff. Although plaintiff describes itself as the mere agent of Federated Investors (the manager of the money market fund represented by the DPCT account), plaintiff's name, not Federated's, appeared on the checks defendant received. The record indicates that it was plaintiff that decided to give immediate credit to defendant when he deposited the two-party checks and that it was plaintiff that later decided to and did "charge back" defendant's account when those checks subsequently were dishonored. In sum, within the meaning of ORS 74.2120(1) (1989), and within the context of that statute, plaintiff acted as a "collecting bank" when it "charged back" defendant's account for the amount of the dishonored checks. The "bank" functions that plaintiff performed in offering a checking account to defendant and in participating in the collection process regarding Chapman's checks written to defendant are exactly the type of "bank" functions that are the concern of ORS 74.2120(1) (1989) in particular and of ORS chapter 74 in general.

Case law from other jurisdictions also supports our conclusion that plaintiff was acting as a "bank." Because the UCC is a uniform law that, to the extent possible, should be interpreted uniformly, case law from other states provides part of the statutory context. *GPL Treatment, Ltd. v. Louisiana-Pacific Corp.*, 323 Or 116, 124, 914 P2d 682 (1996) (examining other jurisdictions' interpretations of UCC provisions as part of contextual analysis); *Security Bank v. Chiapuzio*, 304 Or 438, 445 n 6, 747 P2d 335 (1987) (noting that "the legislative intent to make the UCC a uniform code makes relevant the decisions of other courts that have examined" the question). *See also* ORS 71.1020(2)(c) (1989) (among the "[u]nderlying purposes and policies of" the UCC is "[t]o make uniform the law among the various jurisdictions").[10] As we have noted above, some commentators have questioned (without particularly suggesting the answer)

---

[10] That provision was not changed in the 1993 revision of the UCC.

whether the UCC definition of "bank" contained in ORS 71.2010(4) (1989) is broad enough to encompass "organizations that permit the opening of demand accounts or accounts designated as money market accounts or the like," Bailey and Hagedorn, 1 *Brady on Bank Checks*, ¶ 1.24 at 1-54 to 1-55, such as the account in this case. The pertinent case law from other jurisdictions, however, while not abundant, indicates that organizations that offer accounts such as the one involved here are "banks" within the meaning of UCC Article 4.

A lead opinion in the area, which was cited and relied on by the trial judge in this case, is *Lichtenstein v. Kidder, Peabody & Co., Inc.,* 727 F Supp 975 (WD Pa 1989), *vacated on other grounds* 777 F Supp 423 (1991). In that case, the plaintiff had opened a " 'Premium Account' with Kidder, Peabody," a dealer in stocks and bonds. 727 F Supp at 976. The account "allowed plaintiff to deposit cash and securities, and, through a program administered by Kidder, Peabody in connection with Bank One of Columbus, N.A., to draft checks against these assets." *Id.* After most of the account was depleted, the plaintiff sued Kidder, Peabody, contending that it was liable because it had guaranteed her signature on checks written on the account, when many of those signatures were in fact forged. Kidder, Peabody defended, in part, by relying on a UCC provision that required the plaintiff to report any problem with her account within one year after she received the pertinent account statements. *Lichtenstein*, 727 F Supp at 977.[11] Whether that UCC time limitation applied depended on whether Kidder, Peabody was a "bank" within the meaning of the UCC.

Looking to the Pennsylvania analog of ORS 71.2010(4) (1989) (defining a "bank"), the court concluded that, at least with regard to the plaintiff's account with it, Kidder, Peabody was a "bank." *Lichtenstein*, 727 F Supp at 977-79. The court noted (as we have above) that the UCC

---

[11] In 1989, the analogous Oregon statutory provision was ORS 74.4060(4), although the time limits in the Oregon version of the statute were shorter than those in the Pennsylvania version of the code. The pertinent Oregon provision now is ORS 74.4060(6).

simply defines a "bank" as a person who is "engaged in the business of banking," but the court concluded:

> "While the UCC does not define the 'business of banking,' it has long been held that an entity which in the regular course of business receives deposits and allows withdrawals by draft is in the business of banking. *Warren v. Shook*, 91 US 704, 710, 23 L Ed 421 (1875); *Rosenblum v. Anglim*, 135 F2d 512, 513 (9th Cir 1943)."

*Id.* at 977-78. Although it could find no state case law on point, the federal court determined that

> "it appear[ed] consistent with the stated purposes of [Article 4 of the UCC] and with case law from other states that a brokerage firm which offers check-writing services to its clients should be governed by the same commercial rules that govern checking accounts generally. It would be anomalous to establish one rule for checking accounts administered by a bank, and another rule for checking accounts administered by a brokerage firm in connection with a bank. The public policy interest in establishing a clear system of rights and liabilities between parties to a commercial transaction is the same in both cases."

*Id.* at 979.[12] The court therefore concluded that "a brokerage firm offering checking account services should be considered a bank * * *." *Ibid.*

Decisions from other jurisdictions, presenting facts similar to those involved both in *Lichtenstein* and here, have reached similar conclusions. *See Asian Intern. v. Merrill Lynch, Pierce, Etc.*, 435 So 2d 1058, 1062 (La App 1983) (concluding that Merrill Lynch was a "bank" for UCC purposes, and reasoning that "[s]ince Merrill Lynch provided [its customer] with a general securities and a checking account, much like that provided by a depositary bank to its depositing customer, the relationship between Merrill Lynch and [its customer] is analogous to that of a bank and its customer"); *Pinasco v. Ara*, 219 AD2d 540, 631 NYS2d 346 (1995) (also concluding that Merrill Lynch was a "bank"

---

[12] ORS 71.1020(2)(a) provides that, among the purposes and policies that underlie the UCC, is the intent "[t]o simplify, clarify and modernize the law governing commercial transactions." That provision was in effect during the time period that is pertinent in this case and it remains unchanged today.

"since, for the purposes of the UCC, Merrill Lynch acted as an entity engaged in the business of banking by providing plaintiff with a checking account, honoring drafts, accepting deposits and forwarding monthly customer statements"); *Woods v. MONY Legacy Life Ins. Co.*, 84 NY2d 280, 284, 617 NYS2d 452, 641 NE2d 1070 (1994) (concluding that the provider of a money market account was a "bank" because, "though not a bank [generally], in its operation of MONY Market account defendant was 'engaged in the business of banking' " within the meaning of the UCC).

We agree with the reasoning of those decisions and with the trial court's conclusion in this case. By offering defendant a checking account, and by participating in the bank collection process related to the checks that plaintiff had provided and that bore its name, plaintiff engaged in precisely the type of "banking" activities that are the concern of ORS chapter 74. Here, context, including decisions from other jurisdictions that are a part of that context, makes clear what the text alone may not. For the purposes of this case, plaintiff was a "bank" engaged "in the business of banking." ORS 71.2010(4) (1989). Therefore, as a "collecting bank," plaintiff was required to give the timely notice of dishonor required by ORS 74.2120(1) (1989).

Plaintiff advances certain objections to the conclusion that it was operating as a "bank," none of which we find persuasive. In opposition to the case law that we have cited above and on which we have relied, plaintiff cites *Congress Indus., Inc. v. Fed. Life Ins. Co. (Mutual)*, 114 Ariz App 361, 560 P2d 1268 (1977). In that case, the court determined that a title company had not acted as a "bank" within the meaning of the UCC. There, however, the legal contention that the title company was a "bank" had not been raised at trial and "[t]here [was] nothing in th[e] record showing that the title company in fact was in the business of receiving deposits subject to demand payments * * *." *Id.*, 560 P2d at 1271. We find the case to be inapposite.

Plaintiff also contends that it should not be found to be a "bank" within the meaning of the UCC because its activities would not have been included in the definition of "banking business" set out in the Bank Act, ORS chapter 706. In a

related argument, plaintiff maintains that, because it is a "broker-dealer" subject to regulation under the state securities laws and because the statutory definition of "broker-dealer" excludes "[a] banking institution," it follows that it must not be a bank. We reject both arguments.

At the times pertinent to this case, the Oregon Bank Act defined "banking business" as

> "the business of soliciting, receiving or accepting money or its equivalent on deposit as a regular business whether the deposit is made subject to check or is evidenced by a certificate of deposit, a pass book or other writing, *but does not include*:
>
> "(a) *Depositing money or its equivalent in escrow or with an agent, pending investments in real estate or securities for or on account of a principal*; or
>
> "(b) The business of a savings and loan association or a building and loan association."

ORS 706.005(4) (1989) (emphasis added).[13] Relying on the portion of the statute emphasized above, plaintiff argues that it was not engaged in the "banking business" as defined in the Bank Act, but was instead merely acting as an agent that held defendant's money "pending investments in * * * securities * * *." ORS 706.005(4)(a). If we were to assume that the Bank Act definition of "banking business" applies and controls here, we nevertheless would find it doubtful whether plaintiff's DPCT accounts would in fact be excluded by that definition. Although plaintiff may have invested the money deposited into DPCT accounts in securities or other investments, its activities went beyond that when it structured the account to operate generally as a checking account. Thus, it is questionable whether plaintiff served as a mere agent, simply holding defendant's money temporarily before investing it. Plaintiff instead issued checks bearing its name and participated in the processing of those checks.

In any event, even assuming that the Bank Act definition of "banking business" would have excluded plaintiff's DPCT accounts, we nevertheless conclude that definition

---

[13] The same definition now is found in ORS 706.005(7).

does not override the text and context of the UCC provisions discussed above. As we have emphasized, the concern of those provisions, and in particular the concern of ORS chapter 74, is with the processing of, collection of, and payment on "items," including checks. The issue here is whether plaintiff is a "bank" in that sense, not whether it is a bank as a general matter or is subject to state or federal banking regulations generally. *See* Anderson, 1A *Uniform Commercial Code*, § 1-201:772, at 130 and n 630 (the UCC's imprecise definition of "bank" "permits the code to apply to persons and to organizations which engage in only a restricted area or segment of the total possible banking business"; "[w]hether a person or organization is a bank for the purpose of governmental or administrative regulation of banks presents a different question"); *Lichtenstein*, 727 F Supp at 978 (rejecting an argument similar to the one plaintiff advances here); *Asian Intern.*, 435 So 2d at 1062 (concluding, for the purposes of that case, that Merrill Lynch was a "bank" even though it was not regulated as a bank under the state regulatory scheme).

■ For similar reasons, we reject plaintiff's argument that it is not a "bank" within the meaning of the UCC because, under the terms of the Oregon Securities Laws, ORS 59.005 to 59.370, it is a "broker-dealer" and because the definition of that term excludes "banking organization[s]." ORS 59.015(1)(b)(A) (1989).[14] Even assuming that plaintiff is otherwise correct, the fact that a "banking organization" or institution would not be subject to regulation under the Securities Law provides no occasion for exempting an entity engaged in the "business of banking" from the applicable provisions of the UCC.

■ In arguing that it is not a "bank," plaintiff also relies on subsequent amendments to the UCC definition of a bank. In 1993, the statutory definition was amended to state that a "bank" means any person "engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company." ORS 74.1050(1) (1993); Or Laws 1993, ch 545, § 76. In 1997, the definition was amended

---

[14] That statutory provision has been amended, but remains much the same. *See* ORS 59.015(1)(b)(A).

again to provide that " '[b]ank' means a financial institution as defined in ORS 706.008." ORS 74.1050(1) (1997); Or Laws 1997, ch 631, § 380.[15] Whether plaintiff would or would not be found to be a "bank" under either of those subsequent statutory definitions is immaterial in this case. As plaintiff has conceded, both at trial and on appeal, the pertinent UCC provisions are those in effect when the relevant transactions occurred in 1990 and 1991. Plaintiff's attempt to rely on subsequent statutory amendments contravenes the principle that, " '[u]nless the legislature expressly provides that a statute applies retroactively, the general rule is that the rights and liabilities of a person who is affected by an event are defined and measured by the statutes in effect at the time of the event.' " *Franzen v. Liberty Mutual Fire Ins. Co.,* 154 Or App 503, 509, 962 P2d 729 (1998) (quoting *Barnes v. City of Portland,* 120 Or App 24, 27, 852 P2d 265 (1993)).[16]

Finally, plaintiff argues that it is not a "bank" within the meaning of the UCC because it does not *"itself* * * * accept deposits and allow withdrawals by draft * * *"* and because it does not *"itself * * ** administer the involved checking account * * *."* (Emphasis in original.) To some extent, those assertions are contrary to the facts adduced at trial and, to some extent, the assertions are irrelevant. Irrespective of how plaintiff may have viewed its own role, the DPCT account checks issued to defendant bore plaintiff's name, so plaintiff in effect did allow withdrawals by draft from the account. Moreover, at trial, plaintiff's witness testified that it was plaintiff's policy to give its customers, including defendant, immediate credit for deposits. That testimony established that plaintiff governed at least some of the terms on which deposits were accepted into DPCT accounts. Also, the only account statement that defendant received regarding

[15] ORS 706.008(9) defines "financial institution" as "insured institutions, extranational institutions, credit unions as defined in ORS 723.006, out-of-state credit unions under ORS 723.042 and federal credit unions."

[16] Plaintiff cites a Supreme Court case, *Community Bank v. U.S. Bank,* 276 Or 471, 476, 555 P2d 435 (1976), for the proposition that subsequent statutory amendments may bear on the meaning of an earlier version of a statute. Plaintiff provides no specific reason why that should be true in this case, however, and in *Community Bank* the court looked to a subsequent amendment because there was "no indication" that the change in statutory language signaled a change in meaning. 276 Or at 476. Plaintiff has not established that that is true here.

the DPCT account came in the form of a monthly statement from plaintiff. Thus, at least on this record, it is difficult to credit plaintiff's assertion that it "d[id] not administer the involved checking account[.]" In addition to those factual failings in plaintiff's argument, the argument also clouds the issue, which is whether plaintiff was operating as a "bank" with respect to the DPCT account, not whether some other entity also may have been a "bank" with respect to the account.

In sum, despite plaintiff's arguments to the contrary, we conclude that, at least with respect to defendant's account with it, plaintiff was a "bank" within the meaning of ORS 71.2010(4) (1989). Because plaintiff was a "bank," and was acting as a "collecting bank" with respect to the two-party checks defendant had deposited in his account, it follows that plaintiff was required under the terms of ORS 74.2120(1) (1989) to give defendant timely notice of the dishonor of those checks. As the trial court found, plaintiff failed to give such notice within a reasonable time. Therefore, the trial court correctly ruled for defendant on the merits of his counterclaim unless, as plaintiff now asserts, defendant was entitled to a judgment only if he could prove that he was harmed by plaintiff's failure to give such timely notice. Plaintiff contends that, here, defendant's evidence was not sufficient because he did not and cannot prove any such harm. Therefore, plaintiff argues, defendant is not entitled to an award of damages.

■ ORS 74.2120(1) (1989) did not explicitly require any showing of damage resulting from the failure to give timely notice of dishonor. The statute, which we have quoted above, merely provided that a "collecting bank" that had made provisional settlement with its customer, but that ultimately itself failed "to receive a settlement for the item which is or bec[ame] final," could "charge back the amount of any credit given for the item to its customer's account," if it gave its customer notice of the dishonor "by its midnight deadline or within a longer reasonable time after it learn[ed] the facts[.]" The statute did not expressly provide whether a showing of harm was or was not required.

Although the appellate courts in this state have not considered or resolved the issue, courts in other jurisdictions have drawn differing conclusions regarding whether this version of the UCC provision required a showing of damage. *See* Anderson, 7 *Uniform Commercial Code*, § 4-212:3 at 156 (referring to the split in authority); James J. White & Robert S. Summers, 2 *Uniform Commercial Code*, § 20-6b at 336 (4th ed 1995) (referring to one of the two lines of cases); *Appliance Buyers Credit Corp. v. Prospect Nat. Bank*, 708 F2d 290, 293-95 (7th Cir 1983) (a showing of damage is required); *Smallman v. Home Federal Savings Bank*, 786 SW2d 954, 957 (Tenn App 1989) (no showing of damage is required). On appeal, the parties debate which of the two lines of cases is more persuasive and which we should follow. As defendant argues, however, we conclude that we cannot decide the issue because it is not properly before us.[17] Plaintiff did not preserve the issue in a timely fashion below and, on appeal, plaintiff has assigned error to a nonappealable event—that is, the denial of a motion for new trial made without any preceding motion for dismissal of defendant's counterclaim.

As noted earlier, plaintiff's claim on appeal is that defendant's evidence is insufficient because defendant was required, under ORS 74.2120(1) (1989), to prove that he was harmed by plaintiff's failure to give timely notice of dishonor and because, plaintiff asserts, defendant did not and cannot provide such proof. Plaintiff, however, never moved at trial for dismissal of defendant's counterclaim. ORCP 54 B(2), C.[18]

---

[17] The 1993 revision of the UCC may have resolved the issue for future cases. ORS 74.2140(1) now provides that "[i]f [a bank's] return [of the dishonored item] or notice [of dishonor] is delayed beyond the bank's midnight deadline or a longer reasonable time after it learns the facts, the bank may revoke the settlement, charge back the credit or obtain refund from its customer, *but it is liable for any loss resulting from the delay*." (Emphasis added.) Commentators have suggested that the UCC amendment was intended to embrace the ruling made in *Appliance Buyers* and in other cases and to reject the result in *Smallman* and similar cases. White & Summers, 2 *Uniform Commercial Code*, § 20-6b at 337; Bailey and Hagedorn, 2 *Brady on Bank Checks*, ¶ 24.04 at 24-13 n 52.

[18] ORCP 54 B(2) provides that, in an action tried to the court without a jury, at the close of the plaintiff's case-in-chief the defendant, "without waiving the right to offer evidence in the event the motion is not granted, may move for a judgment of dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." The court "as trier of fact" may rule then or may defer ruling "until the close of all the evidence." ORCP 54 C states that the provisions of the rule also apply to the dismissal of "any counterclaim, cross-claim, or third party claim." The

Until it filed its motion for a new trial, plaintiff never suggested that damage resulting from its failure to give defendant timely notice of dishonor was a necessary component of defendant's case. Plaintiff argues that a timely motion for dismissal of a counterclaim (or, in a jury trial, for a directed verdict) is not a prerequisite to a subsequent motion for a new trial based on a claimed lack of sufficiency of the evidence. As support for that position, plaintiff observes that ORCP 64 B(5)—the new trial provision on which it relies—unlike ORCP 64 B(6), does not explicitly require a prior objection.[19]

■ The Supreme Court, however, considered that very point in *Arena v. Gingrich*, 305 Or 1, 8 n 1, 748 P2d 547 (1988), and determined that, despite the fact that ORCP 64 B(5) does not expressly require a prior objection, "a motion for directed verdict has long been a prerequisite for an appeal assigning lack of evidence, with or without a [subsequent] motion for a new trial." (Citations omitted.) Plaintiff relies on *Lyons v. Browning*, 170 Or 350, 354, 133 P2d 599 (1943), a case that is "not * * * consistent" with the rule later stated in *Arena v. Gingrich*, 305 Or at 8 n 1. *Arena* signaled disapproval of that result, however, and subsequently the court has reaffirmed that a timely motion for a directed verdict is a "necessary predicate" to a subsequent motion testing the sufficiency of the evidence, such as an ORCP 63 motion for entry of a judgment notwithstanding the verdict. *Building Structures, Inc. v. Young,* 328 Or 100, 111, 968 P2d 1287 (1998). In that case, the court held that the failure to assert a timely objection to the verdict "waived" that objection and precluded relying on the objection later "in seeking a new trial." 328 Or at 114. After the court's decision in *Arena*, this court likewise reiterated the rule that "a motion for a directed verdict is a prerequisite to an appeal challenging the sufficiency of the evidence." *Bednarz v. Bay Area Motors, Inc.,* 95 Or App 159, 163, 768 P2d 422 (1989) (citing *Arena*). In addition, this court has noted that the Supreme Court "has also held that the

ORCP 54 B(2) motion for a judgment of dismissal is the nonjury trial analog of the ORCP 60 motion for a directed verdict.

 [19] ORCP 64 B(5) provides that, among the grounds for a new trial, is "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against law." ORCP 64 B(6) states that a new trial may be granted because of "[e]rror in law occurring at the trial *and objected to or excepted to by the party making the application.*" (Emphasis added.)

denial of a motion for a new trial, asserted on the ground that the evidence is insufficient, cannot be assigned as error on appeal." *Bednarz*, 95 Or App at 163 (citing *Erwin v. Thomas*, 267 Or 311, 314, 516 P2d 1279 (1973)).

Whether the problem here is seen as one of trial-level waiver, because plaintiff did not move for dismissal of defendant's counterclaim, or as a bar to assigning error to the denial of its new trial motion, we conclude in either event that we cannot review plaintiff's claim that a showing of damage is a necessary component of defendant's counter-claim based on the UCC. Plaintiff did not raise that claim until it filed its motion for a new trial. Plaintiff filed its motion for new trial before the entry of judgment.[20] Although it now claims that its new trial motion should be seen as the equivalent of a motion for dismissal of defendant's counter-claim and for entry of a judgment in its favor, it did not advance that argument below. Moreover, even seen as a motion for dismissal of the counterclaim based on the sup-posed insufficiency of the evidence, plaintiff's motion was not timely because it was not filed until after the close of all the evidence and until after the trial court had announced its rul-ing on the merits. ORCP 54 B(2), C. Although, before denying the new trial motion, the trial court gave defendant the *option* of producing evidence of harm, defendant declined the opportunity, and plaintiff does not contend that the trial court was obliged to require defendant to produce such evi-dence. In sum, "[i]f there still are cases in which denial of a new trial for lack of any evidence to sustain it can be an abuse of discretion without a prior motion for a directed verdict or peremptory instruction [or, in a nonjury trial, for a dis-missal], this is not such a case." *Arena,* 305 Or at 8 n 1.[21]

---

[20] ORCP 64 F provides that a new trial motion "shall be filed *not later than* 10 days after the entry of the judgment sought to be set aside, or such further time as the court may allow." (Emphasis added.)

[21] On appeal, plaintiff contends that defendant "conceded" below that he could not produce any evidence of harm resulting from plaintiff's failure to give him timely notice of the dishonor of the two checks. The record does not support that contention. Indeed, one of the record citations that plaintiff lists in support of its assertion refers to the point in the transcript where *plaintiff objected* to the intro-duction of any evidence regarding defendant's dealings with Chapman and defen-dant's chances of recovering any money from him. It is true that the trial court overruled that objection, but it admitted the evidence only for the limited purpose of defendant's response to plaintiff's claim of unjust enrichment, which is discussed below.

Plaintiff advances two additional arguments in support of its claim that the trial court erred in denying its motion for a new trial. First, plaintiff contends that, although it may not have raised the damages issue until it filed its new trial motion, that is immaterial because defendant raised the issue earlier. We disagree with the factual premise of that argument. It is true that defendant hinted at the issue by citing *Appliance Buyers*—the leading case supporting plaintiff's position—in its trial memorandum. But it is equally true that, until it filed its motion for a new trial, plaintiff did not take the hint. Certainly, the trial court did not understand that defendant might be required to prove that he had been damaged until plaintiff filed its new trial motion. In rejecting that motion, the trial judge observed that plaintiff had not raised the issue until 17 months after the lawsuit was filed and until more than a year after it became aware of defendant's counterclaim. The court further found that plaintiff had been "unable to suggest *any* persuasive reason why it was so dilatory in asserting it's [*sic*] new theory against [defendant]." (Emphasis in original.) On this record, we see no reason to second-guess those findings.

■ Plaintiff also asserts that ORCP 64 C somehow provides an exception, applying to nonjury trials, to the usual rule that a midtrial motion against the sufficiency of the opponent's evidence is a prerequisite to a motion for new trial on that ground.[22] Even if we were persuaded that ORCP 64 C supported plaintiff's argument, plaintiff could not prevail on this point, which it did not raise below. Although, as we have noted above, the trial court gave defendant the opportunity to produce additional evidence in response to the new trial motion, the court did not require defendant to adduce any such evidence. If it was plaintiff's position that defendant was required to produce its evidence and that the trial court was required to consider it, then plaintiff was obliged to make

[22] ORCP 64 C provides that:

"In an action tried without a jury, a former judgment may be set aside and a new trial granted on motion of the party aggrieved on any grounds set forth in section B of this rule where applicable. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

that clear, rather than waiting until appeal to make that point. Moreover, to the extent that plaintiff is arguing that an advocate in a court trial is not required to advance a timely trial-level objection to the sufficiency of the other side's evidence, plaintiff is wrong. *Falk v. Amesberry*, 290 Or 839, 843-45, 626 P2d 362 (1981) (requiring, in a civil appeal from a court trial, a timely trial-level challenge to the sufficiency of the evidence as a prerequisite to raising the issue on appeal).

To summarize, we conclude that plaintiff was a "bank" within the meaning of the UCC and that it therefore was required, under ORS 74.2120(1) (1989), to give defendant timely notice of the dishonor of the two checks, which it failed to do. We do not reach the issue of whether a showing of consequential damage generally is a prerequisite to recovery for failure to give such notice. Plaintiff did not raise that claim below in a timely fashion and, on appeal, it seeks to challenge a nonappealable event—*viz.*, the denial of a new trial motion based on a claimed insufficiency of the evidence, that was not preceded by any motion for the dismissal of defendant's counterclaim.

■ We turn to plaintiff's contention that the trial court erred in rejecting its breach of contract and unjust enrichment claims. We conclude that the court did not err in rejecting those claims on the merits.[23] With respect to the breach of contract claim, as we have concluded above, ORS 74.2120(1) (1989) required plaintiff to give timely notice of dishonor to defendant. The parties dispute whether that UCC requirement can be altered or waived by a contractual agreement. *See* ORS 74.1030(1) (1989).[24] We need not resolve that dispute because we conclude that, assuming that the contract

---

[23] Because we conclude that the trial court did not err in its ruling on the merits of those claims, we need not resolve defendant's cross-assignment of error claiming that the trial court abused its discretion in allowing plaintiff, in effect, to amend its complaint to add those claims.

[24] The statute provides that:

"The effect of the provisions of ORS 74.1010 to 74.5040 may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable."

This statutory provision was not altered in the 1993 revision of the UCC.

could alter the UCC obligation to give timely notice of dishonor, it did not do so. In arguing that the FSA agreement between them controls here, plaintiff relies on provisions in the contract that provide that, if plaintiff "advance[s] monies on [defendant's] behalf," those funds represent a "loan," and on a paragraph stating that defendant would "remain responsible for any charges to [his] account, whether arising before or after termination." Whatever other effect those provisions may have, they are too general to waive the ORS 74.2120(1) obligation that plaintiff give defendant timely notice of dishonor. No provision in the agreement speaks to, alters, or waives that statutory requirement. It follows that the trial court did not err in ruling against plaintiff on its breach of contract claim.

■ Plaintiff also was not entitled to prevail on its claim of unjust enrichment. As defendant contends, it is debatable whether that doctrine applies in this UCC context. *See U.S. National Bank v. Boge,* 311 Or 550, 559, 814 P2d 1082 (1991) (the " 'purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with [Article 9] UCC procedures *could be defeated by application of the equitable doctrine of unjust enrichment* ") (quoting *Evans Products v. Jorgensen,* 245 Or 362, 372, 421 P2d 978 (1966) (emphasis added)).

■ Assuming that it does apply, however, plaintiff did not prove at least one of the elements of unjust enrichment. Those three elements are "a benefit conferred, awareness by the recipient that a benefit has been received and, under the circumstances, it would be unjust to allow retention of the benefit without requiring the recipient to pay for it." *Jaqua v. Nike, Inc.,* 125 Or App 294, 298, 865 P2d 442 (1993). Here, to conclude that it would be "unjust" to allow defendant to retain the money that plaintiff improperly deducted from defendant's account would undercut the policy that underlies ORS 74.2120(1) (requiring timely notice of dishonor), *see South Sound Nat'l Bank v. Citizens Valley Bank,* 65 Or App at 565 (policy "is to encourage the prompt return of checks"), and would excuse plaintiff's failure properly to have raised and preserved its claim that a showing of damage is a necessary component of defendant's case. Plaintiff did not raise that contention with any more clarity or any earlier with

respect to its unjust enrichment claim than it did in defending against defendant's counterclaim.

Consequently, we affirm on plaintiff's appeal, concluding that the trial court properly ordered plaintiff to pay defendant his monetary damages, and that the court did not err in rejecting plaintiff's breach of contract and unjust enrichment claims.

■ In his cross-appeal, defendant contends that the trial court erred in denying his request for attorney fees. Again, we affirm.

■ Defendant's request for attorney fees was based on ORS 20.090(1), which, at the time of trial, provided:

> "Except as otherwise provided in subsection (2) of this section, *in any action against the maker of any check, draft or order for the payment of money* which has been dishonored for lack of funds or credit to pay the same or because payment has been stopped, the court shall allow a reasonable attorney fee at trial and on appeal to the prevailing party, in addition to disbursements."[25]

(Emphasis added.) Whether defendant is entitled to an award of attorney fees under this statute is a question of law. *Selective Services, Inc. v. AAA Liquidating*, 126 Or App 74, 77, 867 P2d 545 (1994). Much of defendant's argument on appeal is devoted to establishing that it was the prevailing party below—an assertion with which we agree—but the flaw in defendant's request for attorney fees here is that this was not an "action against the maker of any check * * *." ORS 20.090(1) (1995). By its terms, the statute simply does not apply.

In arguing to the contrary, defendant relies on *State v. Hamilton*, 291 Or 283, 287, 634 P2d 208 (1981). There, the court interpreted the definition of "ostensible maker," as used in the forgery statutes, ORS 165.002(6), to include the endorser of a check. The court emphasized, however, that the definition it was applying was broader than that which would

---

[25] After trial, in 1997, the statute was repealed, although a new statute still provides for the award of attorney fees in an action brought against the "maker" of a dishonored check. Or Laws 1997, ch 182, §§ 2, 7.

apply to "commercial instruments." *Id.* at 287. The more common and customary definition of "maker," with respect to a check, is the one quoted in *Hamilton*: " 'One who signs a check * * *.' " 291 Or at 287 (quoting *Black's Law Dictionary*, 861 (5th ed 1979)). We find nothing in the text or context of ORS 20.090(1) (1995) that indicates that some other meaning was intended there. In this case, Chapman, not defendant, was the "maker" of the two checks that defendant deposited into his account with plaintiff. Thus, this was not an action against the "maker" of the checks, and ORS 20.090(1) does not apply.

■ Defendant also argues that he should be entitled to an award of his attorney fees because plaintiff pleaded an entitlement to attorney fees under the same statute, ORS 20.090(1) (1995). An opposing party's citation to an inapplicable statute does not, however, provide an affirmative basis for an award of attorney fees.

Affirmed on appeal and cross-appeal.