STEWART, J.
hWe granted writs in this matter to review the trial court’s denial of a motion for summary judgment by the defendant, Pershing, LLC Delaware (“Pershing”). At issue is whether Pershing is a “bank” under Chapter 4 of the Uniform Commercial Code (“U.C.C.”), La. R.S. 10:4-101 et seq., such that the failure of the plaintiff, Debbie Jo Brooks (“Brooks”), to provide notice of unauthorized signatures on certain checks precludes her claim against Pershing to recover funds wrongly withdrawn from her brokerage account by her former partner, Martha Jill Tingstrom (“Ting-strom”). Because the evidence offered by Pershing in support of summary judgment establishes that it was engaged in the business of banking and is therefore a bank as defined by La. R.S. 10:4-105(1) and because Brooks has failed to show that there is a genuine issue for trial, we find that Pershing is entitled to summary judgment as a matter of law dismissing Brooks’ claim against it.
FACTS
Brooks and Tingstrom began living together in 1994. In 1999, Brooks allowed Tingstrom to take over handling her finances. For five years Brooks did not look at any statements concerning her various accounts. But on December 19, 2004, Brooks got the mail while Tingstrom was away and opened a statement from Hibernia Bank. The statement balance was *1155 much lower than Brooks had expected, and she realized that Tingstrom had been taking money from her Hibernia checking account. Brooks discovered sometime later that Tingstrom had also taken $85,500 from her brokerage account with Trans-america Financial Advisors (“Trans-america”) by forging Brooks’ name on six checks. Brooks had a ^Resource Checking account in connection with her Trans-america brokerage account which allowed her to write checks on the funds in her brokerage account. The first unauthorized check was dated February 19, 2003, and the last was dated March 10, 2004.
Brooks filed suit against Transamerica and Boston Safe Deposit and Trust Co. (“Boston Safe”), on November 21, 2005. The petition stated that the Resource Checking account was with Transamerica and that Boston Safe was the bank with the authority to honor checks drawn on the account. Brooks alleged that the defendants paid the unauthorized checks without obtaining proper identification and approval from her, the account holder.
On March 5, 2007, Brooks amended her petition to add Pershing as a defendant. The amended petition incorporated by reference the allegations of the original petition but did not explain how Pershing was involved. The amended petition listed and included as an attachment copies of the following six checks allegedly forged by Tingstrom:
1. No. 5093, dated February 19, 2003, for $16,000.
2. No. 5096, dated April 17, 2003, for $11,000.
3. No. 5098, dated June 22, 2003, for $3,500.
4. No. 5103, dated November 13, 2003, for $26,000.
5. No. 5106, dated January 31, 2004, for $3,000.
6. No. 5107, dated March 10, 2004, for $26,000.
Asserting that Brooks had failed to notify it of her loss as required by the U.C.C. and as a result her claims were perempted or prescribed, Pershing filed a motion for summary judgment. Boston Safe did the same.
Pershing supported its motion with Brooks’ deposition, an affidavit of Dominick Buonocore, a Director of Pershing, and pleadings filed by Brooks |ain related matters.[1] Brooks’ deposition established that she allowed Tingstrom to handle her finances for five years, during which time Brooks did not reconcile or look at any of her financial statements. Brooks began handling her own finances after discovering that Tingstrom had defrauded her, but she could not say when she looked at a statement for her Transamerica brokerage account or learned that unauthorized withdrawals had been made from that account.
According to Buonocore’s affidavit, Pershing is a clearing agent for Trans-america and “provides account custody, clearing, execution of trades and account statement compilation and dissemination for Transamerica’s clients.” The “Fully Disclosed Clearing Agreement” between Pershing and Transamerica was an exhibit to the affidavit. Buonocore explained that Resource Checking is a product provided by Pershing to Transamerica’s customers to give them the ability to write checks against their brokerage accounts. Pursuant to an “Asset Management Account Services Agreement,” which was also an *1156 exhibit to the affidavit, Pershing retained Boston Safe to manage the retail banking aspects of the Resource Checking accounts for those Transamerica clients who opted to have such accounts. Pershing created and mailed to the account holders monthly statements showing both brokerage transactions and check activity. Statements showing the checks that are the subject of this suit were mailed to Brooks at her home address for the months of February 2003, March 2003, April|42003, May 2003, June 2003, November 2003, January 2004, February 2004, and March 2004. Copies of the monthly statements and the unauthorized checks were attached to Buonocore’s affidavit. Finally, Buonocore attested that Pershing did not receive any notification about the unauthorized checks until it was served with Brooks’ petition in March 2007.
Opposing summary judgment, Brooks argued that no evidence established a depositary relationship between herself and Pershing as would exist between a bank and its customer.
Pershing responded by supplementing its motion with copies of a Customer Account Transfer Form and a Resource Checking Application both purportedly signed by Brooks.
After hearing arguments on November 11, 2008, the trial court requested additional briefing. To further clarify the relationships among the three defendants, Pershing supplemented its motion with the affidavit of Brian Swinehart, a Vice-President at Pershing, who was familiar with its procedures and the business records related to this matter.
Swinehart explained that Transamerica, Boston Safe, and Pershing each performed functions with regard to the Brooks’ brokerage account and the Resource Checking account. Swinehart identified Trans-america as an “introducing broker” and Pershing as a “clearing broker.” He explained that Pershing acts as the custodian for Transamerica’s customers’ accounts and that when Brooks opened the Resource Checking account, the Disclosure Statement disclosed Pershing as the clearing broker. As in Buonocore’s affidavit, Swinehart described Resource Checking as a free service offered |Bby Pershing to allow customers to write checks against money held in their brokerage accounts. Swinehart further explained that Pershing creates the Resource Checking account number and sends it with the customer’s name to Boston Safe, which Pershing retains to act as the bank for the check writing transactions made by customers with Resource Checking. Upon presentment of checks for payment, Boston Safe requests payment from Pershing, who ascertains whether there are sufficient funds in the customer’s brokerage account to cover the check, and if so, withdraws the amount of the check and deposits it with Boston Safe. Swinehart stated in his affidavit that Pershing “opened the Boston Safe account for Brooks, issued her a checkbook, processed checks- she wrote that were transmitted to Pershing from Boston Safe, and sent her monthly statements that reflected the checks drawn against the brokerage account.”
Attached to Swinehart’s affidavit was a “New Account Form” signed by Brooks on March 10, 2000, opening her account with Transamerica, and another copy of her Resource Checking application. By signing the Resource Checking application, Brooks agreed to the terms of the Resource Checking Agreement, which states:
Boston Safe Deposit and Trust Company (the “Bank”) is hereby appointed agent by the person(s) signing this card (the “Client(s)”) and, as agent, is authorized and directed, upon presentment of checks to the Bank, to direct Pershing, *1157 as the Client’s agent and nominee, to withdraw funds from the Client’s brokerage account in the amount stated on the checks presented to the Bank. These funds will be deposited into an account at the Bank, maintained by Pershing on behalf of the Clients, for the purposes of paying the Bank for the checks presented. Pershing is hereby appointed the Client’s agent and, where appropriate, messenger for the purpose of effecting such withdrawals.
|fiThe agreement also informs the “Client,” 1.e. Brooks, that Boston Safe and Pershing have the right to terminate, change or modify the check writing service at any time.
In response, Brooks argued that a genuine issue of fact existed as to whether Pershing had a banking relationship with her. She also asserted that the time periods set forth in La. R.S. 10:4 — 106 should be strictly construed and should not be applied on summary judgment to entities who have not been shown to have had a banking relationship with her.
After hearing arguments on May 3, 2010, the trial court granted summary judgment in favor of Boston Safe, but denied Pershing’s motion.[2] The trial court found that the evidence was not clear enough as to Pershing’s relationship with Brooks to grant summary judgment in its favor. Pershing then requested supervisory review. This court granted Pershing’s writ to review the denial of its motion for summary judgment.
DISCUSSION
As expressed by La. C.C.P. -Art. 966(A)(2), the summary judgment procedure is “favored” and is “designed to secure the just, speedy, and. inexpensive determination of every action[.]” The grant- or denial of a motion for summary judgment is subject- to a de novo review, whereby the appellate court applies the same criteria used by the trial court to determine whether summary judgment is appropriate. Stephenson v. Petrohawk Properties, L.P., 45,296 (La.App.2d Cir.6/2/10), 37 So.2d 1145. This means that a motion for summary judgment shall be granted if the “pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to summary judgment as a matter of law.” La. C.C.P. Art. 966(B).
The party moving for summary judgment bears the burden of proof. La. C.C.P. Art. 966(C). Pershing, who bears the burden of proving that it is a bank as defined by the U.C.C. and that Brooks’ claim against it is precluded, must produce evidence to establish that there is no genuine issue as to material fact and that it is entitled to summary judgment as a matter of law. When there is a properly supported motion for summary judgment, the nonmoving party’s failure “to produce evidence of -a material factual dispute mandates the granting of the motion.” Somaha, v. Rau, 2007-1726, p. 4 (La.2/26/08), 977 So.2d 880, 883. As explained by La. C.C.P. Art. 967(B)
[A]n adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided above, must set forth specific facts showing that there is a *1158 genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be rendered against him.
Because it is the applicable substantive law that determines materiality, whether a particular fact in dispute is “material” for summary judgment purposes can be seen only in light of the substantive law applicable to the case. Roccaforte v. Wing Zone, Inc., 2007-2451 (La.App. 1st Cir.8/21/08), 994 So.2d 126, writ denied, 2008-2266 (La.11/21/08), 996 So.2d 1112.
IsPershing’s motion for summary judgment is based on La. R.S. 10:4-406, which is found in Chapter 4, Uniform Commercial Code — Bank Deposits and Collections. Under La. R.S. 10:4-406(a), a bank that provides its customer with an account statement showing the payment of items must either return or make available the items or provide sufficient information in the statement, meaning a description of the item by number, amount, and date of payment, to allow the customer to reasonably identify the items paid. When a bank provides an account statement in accordance with La. R.S. 10:4-106(a), the customer must:
exercise reasonable promptness in examining the statement or the items to determine whether any payment was not authorized because of an alteration of an item or because a purported signature by or on behalf of the customer was not authorized. If, based on the statement or items provided, the customer should reasonably have discovered the unauthorized payment, the customer must promptly notify the bank of the relevant facts.
La. R.S. 10:4-406(c).
Asserting that Brooks failed to exercise reasonable promptness in examining her account statements and did not provide prompt notice of the checks forged by Tingstrom, Pershing asserts that her claim is barred by La. R.S. 10:4-406(d) and (f), which state:
(d) If the bank proves that the customer failed, with respect to an item, to comply with the duties imposed on the customer by Subsection (c), the customer is precluded from asserting against the bank:
(1) the customer’s unauthorized signature or any alteration on the item, if the bank also proves that it suffered a loss by reason of the failure; and
(2) the customer’s unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank if the payment was made before the bank received notice from the customer of the unauthorized signature or alteration and after the customer had been afforded a reasonable period of time, not | exceeding thirty days, in which to examine the item or statement of account and notify the bank.
[[Image here]]
(f) Without regard to care or lack of care of either the customer or the bank, a customer who does not within one year after the statement or items are made available to the customer (Subsection (a)) discover and report the customer’s unauthorized signature on or any alteration on the item is precluded from asserting against the bank the unauthorized signature or alteration. [Last sentence omitted.]
Under La. R.S. 10:4-406, “a customer is precluded from having funds paid out on a forged instrument restored to his account if his failure to exercise reasonable care in handling the account, either before or after the forgery, substantially contributed to the loss.” Marx v. Whitney Nat. Bank, 1997-8213 p. 4, (La.7/8/98), 713 So.2d 1142, 1145.
*1159 It is clear from Brooks’ deposition that she did not exercise reasonable care in handling .her brokerage account. She did not look at any financial statements for five years. It was not until sometime after December 19, 2004, that Brooks realized that Tingstrom had taken money from her brokerage account by forging Brooks’ name on checks drawn on the account. Brooks did not provide any notice of the forgeries to Pershing until she amended her petition to add it as a defendant in March 2007. It is clear from the record that if Pershing is a bank, then Brooks’ claim against it is precluded under La. R.S. 10:4-406(d) and (f).
A bank and its depositor have a debtor-creditor relationship that is contractual in nature. Marx, supra; Prestridge v. Bank of Jena, 2005-545 (La.App. 3d Cir.3/8/06), 924 So.2d 1266, unit denied, 2006-0836 (La.6/2/06), 929 So.2d 1261. Pershing, a clearing broker, is not a bank in the | Ultraditional understanding of a commercial bank. However, the U.C.C. broadly defines “bank” as “a person engaged in the business of banking.” La. R.S. 10:1-201(4) and 10:4-105(1).
Only one Louisiana case has addressed the U.C.C.’ definition of a bank. The first circuit in Asian International, Ltd. v. Merrill Lynch, Pierce, Fenner and Smith, Inc., 435 So.2d 1058 (La.App. 1st Cir.1983), found La. R.S. 10:4-205(1); which concerns depositary banks as holders, applicable to Merrill Lynch even though it was “not a bank incorporated under the provisions of Title 6 of the Louisiana Revised Statutes.” Id., at 1062. Citing Rosenblum v. Anglim, 135 F.2d 512 (9th Cir.1943), the first circuit noted that accepting deposits and issuing bills and notes has been defined as engaged in the business of banking. While banking involves more than these two functions, a business that performs only these functions as part of its regular business may be engaged in a “banking business.” Merrill Lynch provided its customer with both general securities and a checking account. The court likened these services to those provided by a depositary bank and analogized Merrill Lynch’s relationship with its customer to that of a bank and its depositing customer. The Asian International opinion suggests that the services offered or functions performed by a business entity must be examined to determine whether it is a “person engaged in the business of banking.”
Louisiana adopted the U.C.C. in an effort to harmonize our commercial law with that of the other states. Cromwell v. Commerce & Energy Bank of Lafayette, 464 So.2d 721 (La.1985). As such, l „ jurisprudence from other jurisdictions is instructive when interpreting U.C.C, provisions. This is especially so where we have limited jurisprudence addressing the issue presented here. As provided by La. R.S. 10:1-102(1), the commercial laws are to be “liberally construed and applied to promote its purposes and policies.” The purposes and policies stated in La. R.S. 10:1-102(2) include:
(a) to simplify, clarify and modernize the law governing commercial transactions;
(b) to permit the continued expansion of commercial practices through custom, usage and agreement of the parties;
(c) to promote uniformity of the law among the various jurisdictions.
Pershing cites a number of cases which have addressed the U.C.C.’s definition of “bank” under facts similar to those in this matter. In fact, Asian International, supra, was cited as authority in Lichtenstein v. Kidder, Peabody & Co., Inc., 727 F.Supp. 975 (W.D.Pa.1989), vacated on other grounds by 777 F.Supp. 423 *1160 (W.D.Pa.1991), which held that the defendant, a brokerage firm which offered check writing services to its clients, should be considered a bank for purposes of U.C.C. § 4-406.
In Lichtenstein, supra, the plaintiff had a brokerage account with the defendant, who administered a checking account program in connection with a bank. As in the case sub judice, the checking account program allowed the plaintiff to draft checks against the assets in her brokerage account. The plaintiffs husband forged her signature on various checks and other instruments to make unauthorized withdrawals from the brokerage account. When the plaintiff sued the defendant to recover the money she 112lost, the defendant moved for a partial summary judgment on the ground that her claim was precluded due to her failure to timely notify it of the forgeries.
Addressing the threshold issue of whether the defendant was a bank, the court rejected the plaintiffs argument that state banking regulations should define what is a bank for purposes of the U.C.C. The court noted that the introductory language to the definition section of the state’s U.C.C. provisions, Title 13, indicated that words used in Title 13 would have the meanings given to them in the definition section, unless the context clearly indicates otherwise. A similar provision was included in the state banking laws. Thus, the court concluded that it would “contravene the plain language of the Pennsylvania code” to use the narrow definition of bank under the general banking laws to define what is a “bank” under the U.C.C. We observe that the same reasoning would apply in this state. The general definition statutes of both the Louisiana Banking Law, La. R.S. 6:2, and the U.C.C., La. R.S. 10:1-201, indicate that the definitions provided are for use in their respective provisions.[3]
The Lichtenstein court noted that the U.C.C. was “established to provide a uniform body of rules'governing commercial transactions.” Considering the stated policies of the U.C.C., the court found that a brokerage firm that offers check-writing services should be governed by the | issame commercial rules applicable to checking accounts generally. Id., at 978-979. The court reasoned-that it would be inconsistent to have different rules for checking accounts administered by banks and brokerage firms in connection with banks inasmuch as the public policy of having a clear system of rights and liabilities between , the parties is the same in both cases. Id.
The same reasoning was applied in Woods v. MONY Legacy Life Ins. Co., 84 N.Y.2d 280, 617 N.Y.S.2d 452, 641 N.E.2d 1070 (N.Y.1994), which found that a life insurance company which administered a money market checking account was “engaged in the business of banking” and entitled to rely on Section 4-406 of the U.C.C. The opinion states that the account “resembled an ordinary checking account.” Id., at 284, 641 N.E.2d at 1072. Even though the checks were payable through a bank, the defendant had opened the account, kept the signature card, issued the checkbook, provided the monthly statements, and corresponded with Woods. The court found that the policy underlying Section 4-406, “prompt detection of alterations and forgeries by the person better able to detect them,” applied the same to *1161 both the money market account as well as a regular bank account. Id.
In Edward D. Jones & Co. v. Mishler, 161 Or.App. 544, 983 P.2d 1086 (Or.App.1999), the court rejected the plaintiffs argument that it was not a bank and held that an investment entity that provides its customers with accounts into which they can deposit funds and make withdrawals by check is a bank as defined by the U.C.C. Because the U.C.C. defines bank as well as specific types of banks, the court reasoned that the U.C.C.’s 114concfern is the involvement of banks in the processing, payment, and collecting of items such as checks.[4] The court also examined case law from other jurisdictions, including the cases discussed above, and agreed with their reasoning. Because it issued checks that bore its name, governed some 'of the terms by which deposits were accepted, and provided the monthly account statements, the plaintiff administered the checking account and was found to be engaged in the business of banking. The court rejected arguments that the plaintiff could not be considered a bank for U.C.C. purposes because it would not be considered to be in the banking business under the state’s banking and securities laws.
Nisenzon v. Morgan Stanley DW, Inc., 546 F.Supp.2d 213 (E.D.Pa.2008), likewise held that the defendant, a brokerage firm that offered check writing services in connection with customer’s accounts, was a bank.
While Pershing asserts that the evidence offered in support of its motion and applicable jurisprudence supports its position, Brooks argues that no evidence suggests that Pershing undertook commercial banking duties with regard to her, that she was a customer of Pershing, or that Pershing sought to comply with Louisiana’s banking laws and regulations.
Brooks seeks to distinguish the cases discussed above by arguing that they involved suits between customers and the financial institutions with whom they had depositary accounts and privity. She also argues that the courts in each case applied the law of their respective states to determine whether the financial institution should be treated as a bank. We observe 115that the laws applied were those of the U.C.C. adopted in the respective states, and not dissimilar state provisions governing banking in general. Citing Congress Industries, Inc. v. Federal Life Ins. Co., 114 Ariz. 361, 560 P.2d 1268 (Ariz.App.1977), Brooks argues that there is a split in jurisprudence as to whether state bank regulations or the U.C.C. should apply to define what is a bank.
Congress, supra, involved a foreclosure action stemming from a stop payment issued by a title company, Minnesota Title Company, on checks it had issued for payment of three mortgage installments on behalf of Congress. The title company issued the stop order believing there were insufficient funds in Congress’s account. Challenging the foreclosure, Congress argued that the title company was a bank as defined by the U.C.C. and that under U.C.C. provisions, a check drawn by a bank constitutes payment of the underlying obligation. The court set forth the definitions of bank under the U.C.C. and the state’s banking regulation statute. However, it found no basis for holding that the title company was a bank. It noted that Congress, the appellant, “did not ever raise either such a legal contention or any factual basis to support it before the trial court.” Id., at 364, 560 P.2d at 1271.
*1162 We do not find that Congress, supra, evidences a split of authority among the states as to whether state banking provisions would govern the definition of a bank for U.C.C. purposes. It simply found, regardless of which definition of bank might apply, that there was nothing in the record to show whether the title company was in the banking business.
|1(iWe recognize that the matter before us differs somewhat from the facts of Lichtenstein, supra, and the other cases involving brokerage firms in that here we have the clearing broker who is asserting entitlement to the preclusive effects of the U.C.C. provision found at La. R.S.' 10:4— 406. However, the same reasoning which leads to the conclusion that a brokerage firm that offers checking services to its customers is a bank for U.C.C. purposes applies here, particularly under the facts shown by Pershing.
While Brooks may have had a brokerage account with Transamerica, the evidence offered by Pershing shows that it provided the Resource Checking account as a service to Transamerica’s customers. As part of its regular business, Pershing maintained checking accounts for 'Trans-america’s customers to allow them easy access and use of their funds. Pershing created the account. It supplied the account number and customer’s name to Boston Safe. Like the defendant in Lichtenstein, supra, Pershing administered the checking account in connection with a bank, Boston Safe. Pershing issued the checkbooks, processed the checks transmitted to it from Boston Safe for payment, and provided the monthly account statements.
Brooks argues that there is no showing of any contractual relationship or privity between herself and Pershing. Referring to the “Fully Disclosed Clearing Agreement” between Transamerica and Pershing, she argues that it shows that she was not a customer of Pershing and that nothing in it suggests that Pershing undertook banking duties for her. The clearing agreement referred to by Brooks sets forth the relationship and respective duties between Transamerica and Pershing and is not determinative of |17whether Pershing was engaged in the business of banking in its administration of the Resource Checking account.
Pershing introduced the Resource Checking application signed by Brooks. By signing the application, Brooks accepted the terms of the Resource Checking Agreement. This agreement explains that Pershing maintains the account with Boston Safe on behalf of Brooks and that Pershing is Brooks’ agent for the purpose of withdrawing funds from her brokerage account to pay the checks presented to Boston Safe. The agreement further states that both Boston Safe and Pershing “have the right to change, modify, or terminate this check writing service at any time.” Contrary to Brooks’ argument, her signed Resource Checking application establishes her contractual relationship with Pershing.[5]
Considering the U.C.C.’s broad definition of “bank” and the directive that its provisions must be liberally construed to promote its stated policies and purposes, we find that Pershing’s evidence establishes as a matter of law that it was engaged in the business of banking through its provision of the Resource Checking ae- *1163 count service to Brooks. Brooks’ arguments do not set forth specific facts showing that there is a genuine issue of fact for trial.
Because Pershing was engaged in the business of banking, it is entitled to avail itself of La. R.S. 10:4-406. The evidence establishes that Brooks did not examine the account statements sent by Pershing for the | ^months in 2003 and 2004 when the unauthorized checks were presented and paid. She did not notify Pershing of Tingstrom’s forgeries before adding Pershing as a defendant in March 2007. Therefore, under La. R.S. 10:4 — 406(d) and (f), Brooks is precluded from asserting her unauthorized signatures against Pershing and her claim must fail.
CONCLUSION
For the reasons explained, we hereby grant Pershing’s writ and make it peremptory. The judgment of the trial court is reversed and summary judgment is granted in favor of Pershing,, dismissing Brooks’ claim against it. Costs of appeal are assessed against the respondent, Debbie Jo Brooks.
WRIT GRANTED. JUDGMENT REVERSED AND RENDERED.

. In addition to filing suit against Tingstrom, Brooks also sued A.G. Edwards & Sons, Inc., and PNC Bank, alleging their improper payment of unauthorized checks totaling $51,675.58.'

. However, the trial court did grant an exception of no cause of action asserted by Pershing, and allowed Brooks additional time to amend her petition to state a cause of action. Pershing's exception argued that Brooks’ assertion that it is not a bank meant that her petition failed to state a cause of action against it for improper payment of the unauthorized checks.

. La. R.S. 10:1 — 201(a) states, "Unless the context otherwise requires, words, or phrases defined in this Section, or in the additional definitions contained in other Chapters of this Title that apply to particular Chapters or Parts thereof, have the meanings stated”.
“As used in diis law” precedes the definitions provided in La. R.S. 6:2.

. In addition to defining "bank,” La. R.S. 10:4-105 provides definitions for a depositary bank, payor bank, intermediary bank, collecting bank, and presenting bank. '

. We note that the Resource Checking Application is also signed by an individual on behalf of Transamerica. However, Trans-america signed,as the "Introducing Financial Institution” to guarantee the legitimacy of Brooks’ signature as that of the account holder.