MOORE, J.
It The plaintiffs 6-month-old Yorkshire Terrier, Slade, died during the postoperative recovery period following routine neutering surgery. Plaintiff filed suit in Shreveport City Court against the operating veterinarian, the clinic, and their insurer, alleging that their negligence during postoperative care caused Slade’s death, and the insurer failed to fairly adjust her claim. Five years after the petition was *345 filed, the defendants moved for summary-judgment alleging that the plaintiff will not be able to carry her burden of proof at trial. It supported its motion with an affidavit from an expert stating that the standard of care during Slade’s surgery and recovery had not been breached. After a hearing, the court concluded that the plaintiff failed to produce evidence that the alleged postoperative acts or omissions were negligent or that the defendants breached a duty owed to plaintiff, nor did she show that the alleged negligent acts or omissions were a cause of Slade’s death. It also held that the insurer had properly adjusted the plaintiffs claim. The trial court rendered summary judgment dismissing the plaintiffs claims against the defendants. From this judgment, the plaintiff appeals. For the following reasons, we affirm.
Facts
On August 28, 2007, Judi Milke (hereinafter “Milke” or “plaintiff’), brought Slade, a 6-month-old, 4/¿-pound Yorkshire Terrier, to the Ratcliff Animal Hospital to have him neutered and to have some of his teeth removed. Prior to the procedure, Milke signed a waiver declining a blood test used to ascertain certain disorders of the liver, kidneys or blood that could cause an adverse reaction to anesthesia, at a cost of $118.50. Dr. |2Tracy Pierce, who had treated Slade previously at the clinic, performed the neutering procedure shortly before noon, beginning at approximately 11:45 a.m.
Milke returned to the clinic shortly after 12:00 p.m. to check on Slade and pick up another dog, Perdu, a 16-year-old mixed breed that she had also brought to the clinic that morning for evaluation. The receptionist asked her to wait to speak with Dr. Pierce. Dr. Pierce brought the plaintiff to a vacant room to speak with her, telling her that the surgery was uneventful and Slade was now breathing on his own. During the conversation, Dr. Pierce was summoned by an assistant. Approximately 20 minutes later, she returned and informed the plaintiff that Slade had died. Apparently very upset, Milke immediately left the clinic. There is no evidence that Milke and Dr. Pierce had any conversations regarding Slade’s death at this time.
The plaintiff alleged that, following the surgery, Dr. Pierce left Slade, still intubat-ed, to be monitored by an unlicensed veterinary assistant, Amber Starr Green, who brought the dog into another room to clip its toenails. While performing this task, she noticed that Slade was pale with a shallow pulse and shallow breathing. Amber sought help from another assistant, Rebecca Walker, who moved Slade back to the surgery room and reconnected his en-dotracheal tube to oxygen and began CPR. Amber summoned Dr. Pierce from her meeting with Milke.
Dr. Pierce returned to the room, assessed Slade, and determined that he had no pulse and was not breathing. While continuing CPR, she injected Slade’s intu-bation tube twice with epinephrine (Adrenalin) and injected |sDoxapram IV (a respiratory stimulant). These medications and CPR efforts failed to revive Slade. At 12:30 p.m., Slade expired. Dr. Pierce then informed Milke of this.
Later that afternoon, the plaintiff returned to retrieve Slade’s body. She alleges that she received the dog in a plastic “garbage bag.” She brought the dog home and placed him on her sofa. She reports that a large amount of blood was coming out from the dog’s mouth, and she contends the amount of blood was far more excessive than what could have come from having the three teeth extracted.
The plaintiff is an attorney and represents herself in this case. She contends *346 that she was unable to obtain a straight answer from Dr. Pierce regarding the dog’s death. She alleges that Dr. Pierce refused to talk to her about what happened and referred her to her malpractice insurer, Zurich American Ins. Co.[1] She later met with Dr. Keith Ratcliff, the owner of the clinic, but Dr. Ratcliff stated he was out of the office at the time of the incident and did not examine the dog postmortem. Dr. Ratcliff said he had not spoken with any employees about the incident, although the plaintiff alleges that he ordered that his anesthesia machines be checked immediately after Slade’s death.
Plaintiff filed a claim with the defendants’ insurer, Zurich, who subsequently concluded there had been no malpractice and denied the claim. Zurich stated in open court that it made an offer to settle the claim for $750, the price Milke paid for the dog. Milke countered, demanding | .^approximately $30,000.
The plaintiff filed suit in Shreveport City Court on August 18, 2008, naming Dr. Pierce and the Ratcliff Animal Clinic, through its owner, Dr. Ratcliff, as defendants. She alleged that Dr. Pierce and the clinic were negligent and specifically pleaded the doctrine of res ipsa loquitur. Plaintiff later amended her petition, adding Zurich as a defendant who had acted in bad faith regarding her claim.
After nearly five years of written discovery requests, responses and motions to compel, the defendants moved for summary judgment on grounds that the plaintiff could not produce any evidence that the standard of care was breached, and that any alleged breach was the cause of Slade’s death. After a hearing, the trial court granted the motion and dismissed the suit. The court rendered an opinion stating that there was no evidence that any of the alleged acts or omissions were negligent or a breach of a duty of care, but assuming they were, there was no evidence it was a cause of Slade’s death. The plaintiff filed this appeal.

Assignments of Error

The plaintiff asserts six assignments of error in the trial court’s judgment.
(1) The trial court erred in failing to find Drs. Pierce and Ratcliff were negligent and their negligence was the cause of Slade’s death.
(2) The trial court erred in failing to strike the affidavit of Dr. Hancock, the defendants’ expert.
(3) The trial court erred in failing to apply res ipsa loquitur.
| s(4) The trial court erred in failing to grant the plaintiffs second motion to compel against Zurich.
(5) The trial court erred in failing to find that Zurich was in bad faith.
(6) The trial court erred by granting summary judgment in favor of all defendants.
The appellate record contains numerous exhibits, responses to interrogatories and requests for admission submitted in support of and opposition to the motion, including Zurich’s complete insurance file of this claim and the deposition of Dr. Robert Hancock, defendants’ expert.
Discussion
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief sought by a litigant. Samaha v. Rau, 2007-1726 (La.2/26/08), 977 So.2d 880. Summary judgment shall *347 be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966 B. The mover need not negate every essential element of the opponent’s claim, action or defense; he need only point out the absence of factual support for one or more essential elements. La. C.C.P. art. 966 C(l). If the opponent then fails to produce sufficient support to establish that he will be able to satisfy his evidentiary burden at trial, there is no genuine issue of material fact. La. C.C.P. art. 966 C(2); Babin v. Winn-Dixie La., 2000-0078 (La.6/30/00), 764 So.2d 37; Capital One, NA v. Walters, 47,157 (La.App. 2 Cir. 6/20/12), 94 So.3d 972. An adverse party may not rest on the mere allegations or denials of his pleading, but his response, by affidavits or other appropriate summary judgment evidence, must set forth specific facts showing that there is a genuine issue for trial. La. C.C.P. art. 967 B; Samaha v. Rau, supra; Brooks v. Transamerica Financial Advisors, 45,833 (La.App. 2 Cir. 2/2/11), 57 So.3d 1153.
Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein; sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. La. C.C.P. art. 967 A; Samaha v. Rau, supra.
Appellate review of summary judgment is de novo, using the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Sensebe v. Canal Indem. Co., 2010-0703 (La.1/28/11), 58 So.3d 441.
In their motion for summary judgment, the defendants allege that the plaintiff cannot prove the elements of her claim, namely, the applicable standard of care and a breach of that standard of care and that such breach, if proven, caused Slade’s death. They allege that the same standards used to analyze medical malpractice cases are applicable in veterinary malpractice cases, that is, “to exercise the degree of skill ordinarily employed under similar circumstances by members of their profession in good standing in the community.” Dyess v. Caraway, 190 So.2d 666 (La.App. 2 Cir. 9/27/66); Ladnier v. Norwood, 781 F.2d 490 (5 Cir. 1/30/86) (Applying Louisiana law).
Accordingly, a plaintiff must prove by a preponderance of the evidence: (1) the standard of care applicable to the defendant; (2) the defendant breached that standard of care; and (3) there was a causal connection between the breach and the resulting injury. Schultz v. Guoth, 2010-0343 (La.1/19/11), 57 So.3d 1002. See also, La. R.S. 9:2794.[2] The defendants *348 contend that the plaintiff has not produced any expert testimony to establish these elements of her claim.
The defendants attached to their motion for summary judgment the affidavit of Dr. Robert Hancock, a veterinarian board certified by the American College of Veterinary Surgeons. After summarizing his review of Dr. Pierce’s notes of the procedure, Dr. Hancock’s affidavit states:
No issues were reported with the surgical procedures. However, it is noted [Slade] was allowed to recover on oxygen postoperatively with the technician in charge. A heart rate of 100 was recorded. The technician recovering the patient notified Dr. Pierce that the patient was not breathing and did not have a heartbeat. CPR was performed and was unsuccessful. A necropsy was offered and declined by lathe owner.
Based on the information listed in the record there is no violation of the standard of care with how the patient was treated or recovered. Based on the present records, the patient had no issues until after surgery. There are no guarantees in any surgery or anesthesia. While anesthetic complications are rare, they do occur. CPR was started appropriately by Dr. Pierce. Dr. Pierce acted responsibly and in accordance with acceptable patient treatment. Dr. Pierce acted appropriately and in my opinion acted within the standard of care of a veterinarian.
Plaintiff did not submit an opposing expert affidavit and indicated that she did not intend to do so. She strenuously argues that her claim is a simple negligence claim in which she is not required to show by expert testimony a “standard of care” that was breached and caused Slade’s death. She contends that her opposing documentary evidence regarding postoperative protocols and her statistical data of surgical mortality rates among dogs submitted in opposition to the motion for summary judgment, along with the medical records and discovery responses regarding Slade’s postoperative care, show that Dr. Pierce and the clinic were negligent, and, under the doctrine of res ipsa loquitur, created an inference that more probably than not negligence caused Slade’s death.
The trial court treated Milke’s claim as a negligence claim, stating that she must prove that the specific postoperative acts, errors or omissions she complained about were negligent, a breach of a duty of care, and that this conduct or breach of a duty of care was a cause in fact of Slade’s death. It concluded that plaintiff had not produced any evidence that the acts, errors or omissions alleged were negligent, nor had she proven that they were the cause of Slade’s death.
|nWe now turn to our de novo consideration of the defendants’ motion and whether, as required by La. C.C.P. art. 966, the plaintiff has produced factual support sufficient to establish that she will be able to satisfy her evidentiary burden of proof at trial.
Reduced to its salient points, Milke’s contention that Dr. Pierce and Ratcliff Clinic were negligent and that negligence caused Slade’s death is directed solely at Slade’s postoperative care, and not any aspect of the actual neutering surgery detailed by Dr. Hancock’s affidavit. According to Milke, Dr. Pierce was negligent for failing to remove the endotracheal tube — a *349 tube inserted into the trachea (intubation) and attached to a ventilator during surgery — following the surgery. She contends that a proper protocol required that, after removing Slade from the ventilator, Dr. Pierce, as the anesthetist, must remain ■with Slade until he exhibited a swallowing reflex, signaling that the endotracheal tube could be safely removed (extubation). Then, she should have extubated Slade and taken a reading of his temperature, pulse and respiration (“TPR”). Instead, Dr. Pierce disconnected Slade from the ventilator, but then left the room to speak with Milke, leaving the endotracheal tube in Slade while being monitored by Amber Greene, and who took Slade into another room that had no electronic monitor and no ventilator. She alleges that leaving the endotracheal tube in Slade while removing him from the surgery table, moving and repositioning him in Amber’s lap, more likely than not caused his death. She alleges that Dr. Pierce and the clinic were negligent for not having an established post-operative protocol following neutering surgery, for performing or | inattempting to perform an unauthorized nail trim, and for employing an unqualified staff to handle postoperative care.
Of the 24 exhibits attached to her opposition, two consist of Slade’s medical record including Dr. Pierce’s surgical notes and her account of the incident in a letter to Zurich, which track her surgical notes. Dr. Pierce stated:
Amber Green was the technician assisting in this surgery. Monitoring of the patient was both manual and by pulse oximetry. The castration was uneventful, then I removed 3 deciduous teeth from Slade. Once this was complete, the Sevofurane was turned off and Slade was allowed to breathe oxygen for 3 — 4 minutes. His heart rate was 100 bpm, regular and strong. The oxygen was then turned off, ET tube disconnected from anesthesia machine and cuff deflated. I left at this point to go talk to Ms. Milke about her dogs, while Amber continued to monitor Slade. After approx. 2-3 minutes, Amber asked me to come check on Slade because he had stopped breathing. Rebecca Walker was performing CPR and had reconnected the ET tube back to oxygen. I assessed the patient and found no heartbeat and no respiration. Gave positive respiration with no results, while Rebecca was giving chest compressions. Turned respiration over to Amber and injected 0.5 cc epinephrine into ET tube. Injected 0.5 cc Doxapram IV. Injected another 0.5 cc epinephrine IC to no avail. Chest compressions and ventilation continued with no success. Expired at approximately 12:30 p.m.
Amber Green assisted Dr. Pierce during the surgery. Her account of the incident is found in a response to interrogatories. After Dr. Pierce left to speak with Ms. Milke, Amber remained in the surgery room to monitor Slade until he showed signs of awakening. She brought Slade to Room 2 for observation and monitoring until he was fully awake and to perform a nail trim. While on her lap on a towel, she noticed paleness, shallow pulse, and shallow breathing. She immediately notified Rebecca Walker, who took Slade back to the surgery room, reconnected his ET tube to theJjjventilator and began CPR. According to Amber, Slade did not ever exhibit the swallow reflex, which would signal the time to remove the ET tube.
Milke provided copies of electronic texts of two articles entitled, “Surgery/Anesthesia Recovery Protocol,” and “Responding to Adverse Events in Recovery” available from an Internet website regarding veteri *350 nary practice.[3] In her appellate brief Milke also cites an article entitled “Anesthesia Guidelines for Dogs and Cats,” from the Journal of the American Animal Hospital Association, Nov/Dec 2011, 47:377-385, 383. These articles on postoperative protocol state:
The anesthetist MUST stay with their patient until the endotracheal tube has been removed, and at least one TPR has been recorded.... Remove endotra-cheal tube once animal has regained swallow reflex.
Plaintiff also submitted an abstract from a United Kingdom study on the risks of anesthetic and sedation-related mortality in small animals (dogs, cats, and rabbits). The study concludes that in healthy dogs, the risk of death related to anesthesia and sedation is only .05% or “1 in 895.” Additionally, 47% of the deaths in dogs occurred postoperatively. The study concludes that “[g]reater patient care in the postoperative period could reduce fatalities.”
A key issue raised in this case is whether the plaintiff must have the opinion of an expert to successfully oppose the defendants’ motion for summary judgment. The defendants provided an affidavit by an expert concluding that the standard of care was not breached. We note that the defendant was not required to provide any such affidavit since it is the |12plaintiffs burden of proof to show that the defendants’ conduct was negligent or breached a standard of care that caused the plaintiffs injury. Samaha v. Rau, supra. The plaintiff argues that because she is couching her suit as a claim in negligence under La. C.C. art. 2315, she need not establish by expert testimony a standard of care, breach of that standard of care and causation, but rather can rely on circumstantial evidence to show that Dr. Pierce and the clinic were negligent and that such negligence more probably than not caused Slade’s death.
We find no meaningful distinction in this case whether the plaintiffs claim is classified as a negligence claim or veterinary malpractice. In either case, the plaintiff must establish that the defendants owed the plaintiff a certain duty that was breached, and the breach caused the harm suffered by the plaintiff. In the context of the practice of medicine or veterinary medicine, where the duty owed to the plaintiff involves a degree of skill in the treatment of a patient, that duty is generally determined by a “standard of care” owed to a patient against which the alleged wrongful conduct is measured.
In Pfiffner v. Correa, 99-0924, (La.10/17/94), 94-0963 (La.10/17/94), 643 So.2d 1228, the court observed that expert testimony is not always required to show negligence:
Expert testimony is not required where the physician does an obviously careless act, such as fracturing a leg during examination, amputating the wrong arm, dropping a knife, scalpel, or acid on a patient, or leaving a sponge in a patient’s body, from which a lay person can infer negligence. See Hastings v. Baton Rouge Gen. Hosp., 498 So.2d 713, 719 (La.1986). Failure to attend a patient when the circumstances demonstrate the serious consequences of this failure, and [ ^failure of an on-call physician to respond to an emergency when he knows or should know that his presence is necessary are also examples of obvious negligence which require no expert testimony to demonstrate the physician’s fault. See id. at 719-20. Likewise, where the defendant/physician *351 testifies as to the standard of care and his breach thereof, see, e.g., Riser v. American Medical Int’l Inc., 620 So.2d 372, 377 (La.App. 5 Cir.1993), or the alleged negligence consists of violating a statute and/or the hospital’s bylaws, see, e.g., Hastings, 498 So.2d at 722 (violation of LSA-R.S. 40:2113.4 which imposes duty on a hospital to make emergency services available to all persons in the community without regard to income or insurance protection and hospital bylaws establishing duties for on-call physicians), expert testimony is also unnecessary to establish a malpractice claim.
We hold that expert testimony is not always necessary in order for a plaintiff to meet his burden of proof in establishing a medical malpractice claim. Though in most cases, because of the complex medical and factual issues involved, a plaintiff will likely fail to sustain his burden of proving his claim under LSA-R.S. 9:279Jfs requirements without medical experts, there are instances in which the medical and factual issues are such that a lay jury can perceive negligence in the charged physician’s conduct as well as any expert can, or in which the defendant/physician testifies as to the standard of care and there is objective evidence, including the testimony of the defendant/physician, which demonstrates a breach thereof. Even so, the plaintiff must also demonstrate by a preponderance of the evidence a causal nexus between the defendant’s fault and the injury alleged.
Id. at 1233-34 (Emphasis supplied).
Whether expert testimony is needed, then, turns on whether the veterinary medical issues and factual issues are such that lay jury could perceive negligence in Dr. Pierce’s conduct as well as any veterinary expert could. In our view, all of the plaintiffs allegations of negligent conduct against Dr. Pierce and the Ratcliff clinic require the testimony of an expert to establish a standard of care and whether that standard of care was breached, and an opinion whether a breach of the standard of care more 114likely than not caused Slade’s death.
For example, the plaintiff alleges that Dr. Pierce’s failure to remain with Slade after disconnecting the ET tube following surgery until he exhibited a swallowing reflex and then remove the ET tube constituted negligence. As noted, plaintiff submitted the printout of an Internet article to support this argument. While this document looks promising for the plaintiffs case, it is not competent evidence. Smith v. Roman Catholic Church of Archdiocese of New Orleans, 2008-0181 (La.App. 4 Cir. 11/12/08), 995 So.2d 1257, writ denied, 2009-0110 (La.3/27/09), 5 So.3d 142. It is essentially hearsay, but could possibly qualify as a learned treatise under the hearsay exception if referred to and attached by an expert in testimony or an affidavit. Id.; La. C.E. 803(18). A “standard of care” is a legal determination, whereas standards or practices of a profession, such as the protocols offered as evidence here, are factual matters. While the two are frequently coterminous, i.e., the standard, practice or protocol is, in effect, the standard of care, it is not necessarily the case.[4] Thus, an expert is needed to establish whether the protocols asserted in the document are required by the local standard of care.
*352 Plaintiff also alleges that it was negligent for Dr. Pierce to allow Amber Green to remove Slade to Room 2, which had no monitors and oxygen, with the ET tube still inserted. Although she alleges that leaving the ET tube in Slade’s throat caused his death, there is no evidence of this. Again, expert testimony is needed to determine if this conduct violated the 11sstandard of care and likely resulted in Slade’s death, especially since Slade continued to be monitored by Amber Green, who said Slade never exhibited a swallow reflex, which would have indicated that he could keep his airway open without the need of the ET tube.
We conclude that there is a need for expert testimony to support all of plaintiffs allegations of negligence. However, as noted by the trial court, even if we assumed that she has shown that Dr. Pierce or the clinic breached a standard of care required by the profession, there is simply no evidence that the alleged negligent conduct caused Slade’s death. The statistical data submitted by plaintiff showing that only .05% of healthy dogs (1 in 895) die as a result of surgery does not, in our view, create an inference of negligence unless it is shown that these deaths more likely than not were caused by substandard postoperative care. As noted by Dr. Hancock, the incidence of death due to anesthesia is rare, but it does happen. Although the United Kingdom study submitted by the plaintiff concluded that the mortality rate could be reduced by 47% with improved postoperative care, more than half, 53%, of the mortalities would not be eliminated by improved postoperative care.
For these reasons, based on our de novo review, we conclude that the trial court correctly determined that the plaintiff will be unable to meet her evidentiary burden of proof at trial. We conclude, therefore that her first assignment of error is without merit.
The plaintiff contends by her second assignment of error that the trial court erred by failing to strike the affidavit of Dr. Hancock. While we agree |1fiwith the plaintiff that Dr. Hancock’s affidavit is not particularly enlightening regarding the standards of postoperative care and contains factual errors, such as incorrectly stating that Slade was 4 months old instead of 6 months old, and incorrectly stating that Amber observed that Slade stopped breathing contrary to her answer to interrogatories, it does not appear that the trial court gave much weight to the affidavit. The trial court did not mention Dr. Hancock’s affidavit in its analysis of the plaintiffs claims of negligence against Dr. Pierce and the Ratcliff clinic,[5] and it referenced it only while evaluating the claim that Zurich did not attempt to adjust her claim fairly, noting that Zurich did evaluate the plaintiffs claim and developed expert opinion evidence. As the supreme court observed in Samaha v. Rau, supra, a defendant in a malpractice case who moves for summary judgment on grounds that the plaintiff cannot meet one or more of the elements in its burden of proof is not required to submit an affidavit regarding the standard of care or causation. We conclude that this assignment is without merit.
In her third assignment, the plaintiff asserts that the trial court erred in failing to apply the doctrine of res ipsa loquitur. In Linnear v. Centerpoint Energy Entex/Reliant Energy, 2006-3030 (La.9/5/07), *353 966 So.2d 36, the supreme court explained the proper application of the doctrine of res ipsa loquitur:
The doctrine of res ipsa loquitur applies in cases where the plaintiff uses circumstantial evidence alone to prove negligence by the defendant.... The doctrine, meaning “the |17thing speaks for itself,” permits the inference of negligence on the part of the defendant from the circumstances surrounding the injury.... [T]he doctrine applies when three criteria are met. First, the injury is the kind which ordinarily does not occur in the absence of negligence. While the plaintiff does not have to eliminate all other possible causes, he must present evidence indicating at least a probability that the accident would not have occurred absent negligence. Second, the evidence must sufficiently eliminate other more probable causes of the injury, such as the conduct of the plaintiff or a third person. The circumstances must warrant an inference of negligence. Third, the negligence of the defendant must fall within the scope of his duty to plaintiff. This may, but not necessarily, be proved in instances where the defendant had exclusive control of the thing that caused the injury.
The court stated that “the trial judge determines whether reasonable minds could differ on the presence of all three criteria. If reasonable minds could not conclude that all three criteria are satisfied, then the legal requirements for the use of res ipsa loquitur are not met.” Id. at 44.
Applying this standard, we find that this case does not pass the first requirement. The evidence simply does not establish that this injury was of the kind which does not ordinarily occur in the absence of negligence. As explained in Lin-near, “the event must be such that in light of ordinary experience it gives rise to an inference that someone must have been negligent.” Id. While the plaintiff presented evidence, albeit incompetent evidence, that 99.95% of healthy dogs recover from surgery and that only 1 in 895 suffer death, that statistic alone does not imply that the .05% mortality is due to negligence. Unfortunately, the plaintiff declined an necropsy that might have revealed the cause of death.
Therefore, the trial court did not err in failing to apply the doctrine of res ipsa loquitur.
|]8By her fourth assignment of error, the plaintiff alleges that the trial court erred in failing to grant her second motion to compel against Zurich. Plaintiff sought in discovery documents related to Zurich’s claims process, information on the identity of three doctors, specific information concerning a Dr. Ellis, and the relationship between Zurich and the AVMA/PLIT (American Veterinary Medical Association and Professional Liability Insurance Trust), and whether “Slade’s claim was processed as a malpractice claim or property claim,” and what the notation “xref 211591” means on Bates page number ZCF-007.
Zurich released to the plaintiff its entire claim file consisting of 373 pages. It opposed the motion on grounds that the discovery requests were harassing and overly burdensome and were not related to the litigation.
The court issued an opinion on the motion to compel. It found that discovery questions by the plaintiff regarding all information about the claims procedures of Zurich were irrelevant since a claim was made by the plaintiff, processed and ultimately denied by Zurich. It further found that Zurich’s answer and defense in the lawsuit demonstrated clearly that it considered the case to be a malpractice claim, *354 not a property claim. As far as Zurich’s relationship with three other doctors and the AVMA/PLIT, the court said that this information does not appear to be related to the plaintiffs claim and she is not entitled to it as a third party.
Regarding Dr. Ellis, plaintiff submits that the file shows that Dr. Ellis was a Trust Doctor (PLIT) and allegedly wrote a letter asking questions about the postoperative procedures. There is no record of a response to his 119questions. Since postoperative negligence is the basis of her claim, plaintiff considers the information relevant.
The trial court has broad discretion in ruling on pretrial discovery, and an appellate court should not upset such a ruling absent an abuse of that discretion. Walker, Tooke & Lyons, L.L.P. v. Sapp, 37,966 (La.App. 2 Cir. 12/10/03), 862 So.2d 414, writ not cons., 2004-0088 (La.3/19/04), 869 So.2d 836. This broad discretion includes the right to refuse or limit discovery of matters that are not relevant to the issues. Id.
After our review of the trial court opinion, and the briefed arguments of plaintiff and Zurich, we find no abuse of discretion in the trial court’s ruling and adopt the reasons stated therein.
By her fifth assignment of error, the plaintiff alleges that the trial court erred by failing to find Zurich in bad faith. Plaintiff contends that Zurich has steadfastly sought to delay the case for five years. Plaintiff cites La. 22:1973A, which imposes a duty on insurers to adjust claims fairly and promptly and make reasonable efforts to settle. The statute reads:
A.An insurer, including but not limited to a foreign line and surplus line insurer, owes to his insured a duty of good faith and fair dealing. The insurer has an affirmative duty to adjust claims fairly and promptly and to make a reasonable effort to settle claims with the insured or the claimant, or both. Any insurer who breaches these duties shall be liable for any damages sustained as a result of the breach.
B. Any one of the following acts, if knowingly committed or performed by an insurer, constitutes a breach of the insurer’s duties imposed in Subsection A of this Section:
(1) Misrepresenting pertinent facts or insurance policy provisions relating to any coverages at issue.
(2) Failing to pay a settlement within thirty days after an |20agreement is reduced to writing.
(3) Denying coverage or attempting to settle a claim on the basis of an application which the insurer knows was altered without notice to, or knowledge or consent of, the insured.
(4) Misleading a claimant as to the applicable prescriptive period.
(5) Failing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause.
(6) Failing to pay claims pursuant to R.S. 22:1893 when such failure is arbitrary, capricious, or without probable cause.
C. In addition to any general or special damages to which a claimant is entitled for breach of the imposed duty, the claimant may be awarded penalties assessed against the insurer in an amount not to exceed two times the damages sustained or five thousand dollars, whichever is greater. Such penalties, if awarded, shall not be used by the insurer in computing either past or prospec *355 tive loss experience for the purpose of setting rates or making rate filings.
D. The provisions of this Section shall not be applicable to claims made under health and accident insurance policies.
Although a right of action is available to both insureds and third party claimants under this statute, only commission of one of specific acts listed in statute will support private action under such statute. Smith v. Midland Risk Ins. Co., 29,793 (La.App. 2 Cir. 9/24/97), 699 So.2d 1192. In other words, third parties must establish that the insurer did one of the listed acts under Section B.
After review, we conclude that the trial court correctly found that Zurich promptly investigated the plaintiffs claim and determined that no malpractice had occurred. We simply find no merit in the plaintiffs claim that Zurich was in bad faith.
| a|This assignment is without merit.
Plaintiffs sixth assignment alleges that the trial court erred in failing to assess damages. Because there has been no judgment of liability against the defendants, no damages are warranted.
CONCLUSION
For the reasons stated in our de novo review above, we conclude that the trial court did not err in rendering summary judgment dismissing the plaintiffs claims at her cost. Accordingly, the judgment of the trial court is affirmed at the cost of the appellant.
AFFIRMED.

. Dr. Pierce’s notes indicate that she met twice with Milke in the weeks following the incident to discuss the incident.

. R.S. 9:2794A, establishes the burden of proof in malpractice claims against physicians, dentists, optometrists, and chiropractic physicians. It does not specifically list veterinarians in the statute. The statute states that a plaintiff must prove:
(1) The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.
(2) That the defendant either lacked this degree of knowledge or skill or failed to use *348 reasonable care and diligence, along with his best judgment in the application of that skill.
(3) That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

. The exhibit cites http://ruralareavet.org/ PDF/Clinic Protocols-Recovery.pdf.

. Joseph H. BCing. "The Standard of Care for Veterinarians in Medical Malpractice Claims,” 58 Tenn. L.Rev. 1, 5 (Fall, 1990).

. The trial court did erroneously state that Slade's death was instantaneous, which it possibly determined from Dr. Hancock’s affidavit stating that Slade just stopped breathing.